Filed 12/29/22  P. v. Johnson CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H048633 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1910682) |
| v. | |
| CHRISTOPHER LYON JOHNSON, | |
| Defendant and Appellant. | |
| | |
| THE PEOPLE, | H048722 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1910682) |
| v. | |
| ANTOINE WILLIAMS, | |
| Defendant and Appellant. | |

Appellants Christopher Johnson and Antoine Williams appeal from judgments entered after a jury found them guilty of aggravated sex trafficking of a minor and other related crimes.  The trial court sentenced both defendants to 15 years to life in prison.

Between their two appeals, which we have considered together for oral argument and disposition, Johnson and Williams raise numerous claims of error.  Stated broadly,

1

Johnson and Williams, who are Black, challenge the trial court's admission of certain expert witness testimony as founded on stereotypical "profile evidence" infused with racial bias. They contend that reversal is required under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (Racial Justice Act or Act), which the Legislature enacted to eliminate racial bias and discriminatory practices from California's criminal justice system. (Stats. 2020, ch. 317, § 2, subds. (i), (j).) We recognize the force of Johnson's and Williams's arguments on this point and agree that some of the language they identify raises concerns. However, on this record, we decide that the Racial Justice Act was not violated.

In addition, Williams and Johnson jointly or separately challenge the sufficiency of the evidence to prove the special allegation finding of coercion as to the sex trafficking count, the trial court's jury instruction as to mistake of age, the admission of hearsay statements and statements made during a custodial interrogation, the cumulative prejudice of these alleged errors, and various aspects of their sentences.

We reject Johnson's and Williams's challenges to their convictions but vacate their sentences and remand with directions for resentencing.[1]

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Procedural History

In November 2019, the Santa Clara County District Attorney filed a second amended information (information) charging Johnson and Williams with the following counts[2]: Human trafficking by causing a minor victim to engage in a commercial sex act

---

[1] Williams's appellate counsel has filed a petition and supplemental petition for writ of habeas corpus (No. H050131), based largely on application of the Racial Justice Act. This court ordered that the original petition would be considered with this appeal, and we have disposed of both petitions by separate order filed this day. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

[2] The information also charged a third defendant, Curtis Lee Russell, with several counts. Russell resolved his case separately, and it is not at issue in this appeal.

(Pen. Code, § 236.1, subd. (c);[3] count 1), with the allegation that the offense involves force, fear, coercion, duress or threat of unlawful injury (§ 236.1, subd. (c)(2)); pimping where the prostitute is a minor under the age of 16 (§ 266h, subd. (b)(2); count 2); procuring a minor under the age of 16 for prostitution (§ 266i, subd. (b)(2); count 3); pimping where the prostitute is an adult (§ 266h, subd.(a); count 5); and procuring an adult for prostitution (§ 266i, subd. (a)(1)); count 6). The information additionally charged Johnson with lewd or lascivious act on a child aged 14 or 15 (§ 288, subd. (c)(1); count 4).

The information named A. Doe (hereafter, A.),[4] who is White, as the alleged minor victim in the first four counts and identified S. Doe (hereafter, S.), who is Black, as the alleged adult victim in counts 5 and 6.

The trial court empaneled a single jury to hear evidence regarding both defendants. On November 26, 2019, the jury found Johnson and Williams guilty of all counts and found true the coercion allegation attached to count 1.

As to Johnson, the trial court sentenced him to 15 years to life for his sex trafficking conviction on count 1 and imposed concurrent terms of four years on count 5 and two years on count 4. The court also imposed terms of six years on counts 2 and 3 and four years on count 6, all of which the court stayed pursuant to section 654. In addition, the court ordered Johnson to pay various fines and fees.

As to Williams, the trial court sentenced him to 15 years to life for his sex trafficking conviction on count 1 and imposed a concurrent term of four years on count 5. The court also imposed terms of six years on counts 2 and 3 and four years on count 6, all

---

[3] Unspecified statutory references are to the Penal Code.
[4] "Doe" is a pseudonym used in the information. We refer to the victims and other witnesses by first name or first initial for clarity and to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

of which the court stayed pursuant to section 654.  In addition, the court ordered Williams to pay various fines and fees.

*B.  Summary of Evidence Presented at Trial*

A. was born in June 2004 and was 15 years old at the time of trial.  When A. was nine, her mother died of a heroin overdose.  At age 10, A. entered the child welfare system in Michigan.  She lived in a series of group homes and ran away numerous times.

In September 2018, A. ran away from a group home because she was dealing with substance abuse and "wanted to use drugs."  A. ended up in Chicago.  There, she stayed with different men—each for a day or two at a time, though her last relationship with a man named Antonio lasted about five months.  Sometimes men would give her money or food and sometimes she would have to "do stuff" for it.  She prostituted while in Chicago and during the time she was with Antonio, but she denied that Antonio was her pimp.  A. referred to Antonio as " 'daddy' " and he called her " 'bitch' " or sometimes " 'ho bitch.' "  A. later kept in touch with Antonio throughout her time in California.

In March or the beginning of April 2019,[5] around the time her relationship with Antonio ended, A. met a man on a Web site called "Plenty of Fish."[6]  Her profile claimed she was in her mid-20's or even 33 years old.  The man drove her to a hotel in Gary, Indiana, where another man was waiting.  She had sex with the man waiting in the hotel room.  (A. testified the man waiting in the hotel was Johnson, though evidence obtained from Johnson's cell service provider later showed Johnson's cell phone had not left California during that time.)[7]

A. left the hotel room after she and the man got into a fight, and she met Williams, who was outside.  Williams went by the name of " 'Twan.' "  Williams asked her what

---

[5] Unless otherwise indicated, all dates were in 2019.
[6] A. described Plenty of Fish as a dating Web site, though it was elsewhere described in testimony as a prostitution Web site, along with another site called "Skip the Games."
[7] A. gave several accounts to the investigating officer of how she met Johnson.

4

was going on and if she needed anything. She told Williams she had gotten into a fight and had nowhere to go. He invited her to his room, gave her ecstasy, and asked if she wanted to go to California to make money. She thought he meant to sell drugs, and she agreed.

Someone picked A. and Williams up the next day and took them to the train station. They traveled for about three days and arrived in Sacramento. Records from Williams's cell phone showed that Johnson texted Williams on April 22 with an intercity bus ticket and a train ticket, followed by a message from Williams stating " 'For me and her.' " On April 25, Williams texted Johnson an arrival time of 1:50, and Johnson responded " 'Okay.' " A. testified that she never told Williams her true age. Rather, she told him she was 33. In fact, she was 14 years old.

In Sacramento, Johnson, his fiancée (Megan M.), and his stepfather (Russell), picked A. and Williams up from the station and drove to Megan's house in Red Bluff. Johnson and Megan took A. to a store and bought her a few outfits. The group smoked drugs and drank alcohol. At one point Williams thought A. was talking about him and began shaking a liquor bottle in her face like he was going to hit her. Williams kept "antagonizing" her as he got more drunk. Johnson and Megan kicked him out.

Williams later came back and began hitting A., who fought back. Williams kicked and stomped on A.'s face, causing a broken blood vessel in her eye and leaving a shoe-shaped mark. Johnson and Megan kicked Williams out of the house but let him return the next morning after he promised to " 'chill out and settle down.' " At that point, A. had no money and nowhere to go. Nevertheless, she had decided she "wasn't gonna go with" Williams. She asked Johnson if they could still try to make money together, and he said yes.

The next day, Johnson drove A. to a hotel. On the way, he picked up S. Doe (the adult victim named in counts 5 and 6). Johnson, A., and S. stayed at the hotel for a few

5

days, drinking and using cocaine, marijuana, and ecstasy, which Johnson supplied. Johnson, who was then 39 years old, had sex with A. during that time.

After a few days, Johnson drove the group (which included A., S., Russell, and Williams) in a circuit to Southern California and back, stopping at various locations along the way. They stayed in motels for a day or two at a time, or sometimes longer "if the money was good." Johnson would drop A. and S. in a room. At first, A. would go into the bathroom and listen when clients came to the room to have sex with S. A. believed that Johnson wanted her to see how he operated as a pimp.

After a short time, A. began prostituting for Johnson. S. would go into the bathroom when Johnson sent up a "date"[8] for A. Johnson would text A. to say a date was coming to the room, for how long, and how much the man was to pay her. A. did not negotiate the amount of money or type of sex act but understood she had to do what the man said. If she failed to limit the sex to the amount of time dictated by Johnson, "he would continuously call the hotel [room] phone and it would be a problem." Johnson took all the money A. received, but sometimes he let her keep a dollar or two. A. was not able to leave the hotel whenever she wanted. If she missed the date, it was "the end of the world." Because A. was afraid Johnson would be violent with her like Williams had been, she "just obeyed [Johnson]."

Since A. had a cell phone and S. did not,[9] Johnson would also text her to tell S. to get ready because a date was coming. S. was "always high," addicted to methamphetamine, and experienced mood swings when she did not get her drugs. A. testified, over the objections of defense counsel, that S. missed her kids and was prostituting because she had nowhere to go, could not see her kids, and was addicted to

---

[8] Consistent with its usage at trial, we use the word "date" to refer to a scheduled commercial sex transaction between a prostitute and a customer seeking sexual services.
[9] A. testified that S. had her own cell phone but after it broke, Johnson told her she was not getting another phone.

methamphetamine and had no one to supply her.[10]  Johnson supplied S. with methamphetamine.

At the beginning, A. "had no problem" with the situation, and Johnson was providing her with food.  After about the first week, when she asked for food he would say, " 'All [you do] is eat, and I'm not buying you anything until you finish a certain amount of dates'—and all this other stuff."  A. was using marijuana, alcohol, and cocaine supplied by Johnson.  A. was "always on drugs," so it was rare when she did eat and she was "really hungry" for food.

The group (Johnson, A., S., Russell, and Williams) went to San Diego, Pismo Beach, San Jose, Redding, and Chico.  A. estimated she had "[a]t least more than 70" dates during that time.  She testified, "There [were] times where he would send a date for $40 and make me have sex with him for, like, almost an hour for $40.  And just keep sending them up, because he wanted the money so bad."

From Chico, they were supposed to go to San Diego but instead went to San Jose.  It was their second time in San Jose.  On the way to San Jose, they stopped to pick up a young woman near Sacramento.  The young woman's name was C.

C. was 20 years old at the time of trial and testified pursuant to a subpoena.  She met Johnson online in March and they began communicating.  Johnson invited C. to take a trip to San Diego.  She thought it would be a romantic getaway.  On May 26, Johnson texted her about a change of plans and told her there were a few people with him.  He asked if they could make a stop in San Jose.  Johnson, who was driving Williams, an "older man" (Russell), and "two girls" (A. and S.) arrived in his gold SUV at C.'s house outside of Sacramento.  During the drive, according to C., A. seemed "fine" and "spunky."  Everyone was listening to music and "having a good time."

---

[10] S. did not testify at trial.

The group drove to the Motel 6 in San Jose and ultimately booked three rooms. C. and Johnson got a room together. A. testified that C. did not know what was going on, and, when A. mentioned prostitution, Johnson told her to watch her mouth.

Johnson asked C. to borrow her phone. He sent pictures of A. to the phone and posted the pictures on the Internet. C. was not sure if there were pictures of both girls, or only pictures of A. At one point, Johnson was on the phone with Williams who appeared to be watching people coming into the motel. C. deduced that the girls were prostitutes and texted a friend saying, " 'We stopped in San Jose because he got hos with him. So [w]e in a [r]oom and they in another making money for us.' " C. did not suspect A. was a minor and thought she and C. were about the same age. C. never saw Johnson with a firearm.

A. had her own room at the Motel 6 in San Jose because she and S. had fought, and A. told Johnson she was "not doing anything" with S. in the room. Johnson got A. a bottle of liquor and a pack of cigarettes. A. got drunk and asked him to come to the room because she wanted to have sex with him. They had sex. Afterward, she asked him about his intentions. He told her " 'to get money,' " which made her "really irritated" because she "thought it was gonna be something different." Johnson had begun to show her that he did not care about her—he "didn't care" that A. was hungry or craving drugs and got angry when she asked for food. She had not craved cocaine before Johnson. He used cocaine with her, then would get angry when she asked for it.

The group's arrival at the Motel 6 in San Jose on May 26 occurred around the anniversary of A.'s mom's death—a time when A. always felt her mom's presence, which made her want to turn herself in. A. felt "over everything" and was tired of asking for food and money. She texted a crisis hotline. A. texted that Johnson had a gun at the motel so the police would come quickly, before the next date came to her room. (A. later testified there was no gun; she just wanted the police to arrive).

8

Several San Jose police officers responded to A.'s text. Officers found Williams lying in the back seat of Johnson's gold SUV holding a cell phone. Williams exited the vehicle upon the officer's orders and stated, " 'The girl is in the room. I got her a room.' " Williams had the key to room 423 in his pocket; he did not have a weapon or significant amount of cash. Officers confiscated a black cellular flip phone located on the SUV's back seat. Williams later told Detective Gurbaksh Sohal that the black flip phone belonged to him.

Officers found A. in room 423. She was alone and appeared scared. She told the police, " 'Please don't let it be known that I'm telling on him. He's going to kill me.' " A. was taken to the hospital and treated for dehydration and a medical condition. Officers later found S. in room 319 and apprehended Russell exiting room 344. They took Johnson, who was in the room with C., into custody. A search of Johnson's room revealed no weapons, contraband, or large quantities of cash. A search of A.'s room revealed a condom wrapper and bottle of alcohol, which was about two-thirds empty.

Detective Sohal of San Jose Police Department's Human Trafficking Unit interviewed A. several times, including on the day the police responded to the Motel 6, the next morning in the hospital, and several days later. A. initially said that she had been kidnapped at gunpoint. A. also told the detective that Johnson and Williams had picked her up in Chicago, forced her to take drugs and to prostitute for them, and had taken her back and forth to California, holding her for a total of nine months. None of that was true.

A. testified that she had lied because she was drunk, tired, hungry, and wanted to lie down and go to sleep. She "just told him anything to get him off [her] back." Later, when she was sober and the detective asked her questions, she told him the truth. She also indicated that she did not remember much of what she had said at the hospital and that " 'sometimes [she] make[s] up stuff when [she's] really tired and drunk.' "

9

However, she continued to say that Johnson had a gun. The first time she acknowledged Johnson did not have a gun was at trial.

Detective Sohal recovered cell phones associated with Williams, Johnson, Russell, A., and C.[11] Records extracted from the cell phone belonging to Williams showed A.'s cell phone number listed under the name " 'Bitch' " and Johnson's cell phone number listed under the name " 'Folk.' " There were only a few messages extracted from Williams's phone due to the phone's older technology. In one exchange on April 27, Williams texted A.: " 'Where you at' " and " 'You fuck my cuz.'[12] [¶] . . . [¶] 'You better have some money. Not know [*sic*] wet ass.' " Detective Sohal testified that based on his training and experience, the reference to " 'wet ass' " meant that she better not come back having had sex and not have money. In a text that same day at 3:08 a.m., Williams told Johnson " 'What up,' " followed by " 'Am beating her ass' " and " 'Don't bring her back.' "

Text exchanges from Williams's cell phone also appeared to show him communicating with customers responding to prostitution advertisements. For example, one message says " 'I'm Asian looking for an hour of cream, cream pie. Is it okay?' " and Williams responded "200." Detective Sohal testified that "200" was the price for that sex act. In another exchange, the message says " 'Babe, can I come inside of you?' " and Williams responded, " 'Bring condom.' " In those exchanges, Williams provided the address of the Motel 6 on Fontaine Road in San Jose. On cross-examination, Detective

---

[11] Sohal testified about the cell phones recovered, the phone numbers associated with each phone, the police department's extraction of data from the phones, and the search warrant used to obtain call detail records and locational data from the relevant cell service provider, as well as a search warrant to Skip the Games using the ID number obtained from Johnson's phone and associated with the ad for A. The prosecution also presented expert testimony by a district attorney investigator about the software program used to read, interpret, and map call detail records.

[12] Johnson is Williams's cousin.

Sohal acknowledged that nothing in the text messages specified that the transactions were for A.

One of the cell phones belonging to Johnson listed A. under the name " '2 Bitch' " and Williams under the name " 'G Twon.' " The call log and text messages were missing or had been deleted, although data from the carrier showed calls and text messages that occurred during the requested time frame. Data extracted from Johnson's cell phone showed images of A., including images used for prostitution ads on the Web site Skip the Games. Advertisements placed from Johnson's cell phone and an account " 'WETS 98264' " for a female escort in San Jose on May 26, showed pictures of A. in different sexual positions on a bed, of her bare breasts, buttocks and torso, of her fingers spreading herself to show her vagina, and of what appeared to be a Snapchat picture of her face with the caption " 'cruel hair' " and of one that said " 'I love white guys.' " The advertisement description was " 'Hot, Ready, and Super Wet' " and listed A. as 22 years old. It listed A.'s body and breast size and the type of services provided (e.g., " 'I see men. Exotic mix. Accepted payments cash. Available for in call.' ").

The same advertisement to Skip the Games had been posted for Chico the day before the San Jose advertisement, Redding for several days before that, Chico again for several days, and multiple times for San Jose on May 12, 13, and 14. The same advertisement depicting A. had also been posted for San Luis Obispo, Ventura, and San Diego on several dates earlier in May and late April, with the description " 'New in Town. Come See Me Now. Wet.' " Ads posted from the same account for dates in March and February showed pictures of two other girls whom the police had not identified.

Records taken from A.'s phone included her communications with the crisis hotline and with 911, pictures of the same Amtrak ticket sent from Johnson's phone, and photos and videos taken between April 23 and April 25 that appeared to be taken during the train trip. A.'s phone also contained numerous text exchanges with Johnson between

11

May 18 and May 26.[13]  These consisted primarily of Johnson telling A. that a customer was on his way for her, responses to her requests for food, directions for A. to tell S. to get ready for a date, and his reprimands of A. or S.  For example, on May 18, A. asked Johnson " 'Can you all get some food, please' " and he responded " 'You all ready to go' " and " 'You have a date coming up.  QK 60.' "  A. responded "Here."  Detective Sohal testified that " 'QK60' " refers to a sex act " 'quickie,' " typically less than a half-hour, and " 'Here' " meaning the customer had arrived for the purpose of the trafficker tracking the time.

In another exchange, Johnson texted A. stating, " 'You have a date coming to the door.  HHR.  . . .  120,' " meaning the customer would be paying $120 for a half-hour of sex.  On May 19, A. texted Johnson at 11:01 p.m., asking, " 'Can I get some food before places start closing?' " and he responded " 'Yes.' "  Johnson later texted, " 'You have a 45-minute date.  Be there in 20 minutes.  100 and two zip of OG Cush.' "  This meant the customer would arrive in 20 minutes for a 45-minute sex act and would pay $100 plus two baggies of high-quality marijuana.  Another exchange directed A. to " 'Tell that bitch to get ready,' " referring to another woman (presumably S.) and indicating a half-hour for $100.  In other texts, Johnson informed A. she had a one-hour date for $200, a " 'QV' " or quick visit for $80, a date arriving in 20 minutes and paying $400 for two hours, a date paying $240 for one hour and " 'two [p]ops,' " meaning the customer could ejaculate more than once, a one-hour date arriving in 15 minutes for $200, and a one-hour date for $200 " '67W and he bringing you ports,' " meaning her customer was a 67-year-old White male and bringing her cigarettes.

In one text exchange, Johnson informed A. of a date paying $80 for a half-hour; she responded " 'Okay.  He's getting me 100 for HHR.' "  Detective Sohal testified this meant that A. was informing Johnson that the customer had paid her above the negotiated

<hr>

[13] The text messages recovered from A.'s phone began on May 17.  She testified that Johnson had told her before that date to delete the messages, and she did.

price so there would be no discrepancy in the amount of money she had. A. texted at one point, " 'Can I get some food from [Denny's], Daddy?' " and Johnson responded that a customer was " 'Coming to the door.' " On May 24, A. texted Johnson asking if she could go to the 24-hour store across the street and saying " 'I'm hungry ASF' [as fuck]." Johnson told her " 'No,' " and A. responded, " 'Okay.' " Other text conversations included demands for A. to give the money to Johnson (" 'Come down to the back and bring that money' ") and references to women being punished for breaking the rules (" 'That get a bitch killed, OMM [On My Mama]' ").

Early on May 26, after A. texted Johnson that she was walking to Denny's to grab her food, he responded " 'And next time bitch don't tell me what the fuck you gonna do bitch. I'm walking to [Denny's]. Who the fuck said you can just walk when the fuck you want bitch?' " A. responded, " 'I'm sorry. It won't happen again Daddy.' " Later on May 26, A. reminded Johnson that he said she was " 'getting [her] own room and [he] would give [her] some dick.' " She asked if he would pay her phone bill and he said, " 'Yes when I make money back.' " In response to A. texting a " 'serious question' " about Johnson's " 'intentions with [her] overall,' " Johnson said, " Bitch to hoe and get money the fuck you want bitch?' "

On cross-examination, A. explained that she had had a cell phone since she was 10 or 11 years old. She used the phone to post profiles of herself on Web sites like Plenty of Fish but posted pictures only of her face, never her body. She had a phone with her during the time she was in California and used that phone to text the crisis hotline.

Sometimes A. used a fake name and fake identification. She acknowledged that she was "dealing with substance abuse" before she began prostituting for Johnson but primarily used marijuana and ecstasy, "barely" drank alcohol, and used cocaine only occasionally. A. testified that she voluntarily consumed the drugs and alcohol that Johnson provided. Detective Sohal confirmed on cross-examination that data from A.'s

13

phone showed that she regularly used her phone between January and May, including applications like Facebook and Snapchat.

The morning after their arrest, Detective Sohal interviewed both Williams and Johnson. Johnson gave Detective Sohal his date of birth (he was 39 years old), acknowledged he was the owner of the gold Mercedes Benz SUV, and stated that he had sex with A. on May 26 at the Motel 6. Johnson also told Sohal that he had paid $575 for A.'s train ticket to Sacramento and she had only repaid him $300.

Williams gave Detective Sohal his date of birth (he was 43 years old) and acknowledged that the black flip phone found in Johnson's SUV belonged to him.

Cell phone locational data and call detail records obtained by search warrant to the service providers of the phones recovered and associated with A., Johnson, Williams, and Russell, showed that Williams and A. were in the same area of Indiana on April 22 when they first communicated by cell phone. The phones belonging to A. and Williams traveled together to Chicago on April 23, then together westward until arriving in the Sacramento area on April 25.

Locational data also showed the phones belonging to Johnson, Williams, and A. traveling together from Sacramento to Red Bluff and then from Sacramento, to Carlsbad, San Diego, Los Angeles, Ventura, Pismo Beach, San Luis Obispo, San Jose, Sacramento, Redding, and eventually back to San Jose. Advertisements placed on the Web site Skip the Games during this trip corresponded with these locations, according to the cellular data.

A. testified that Johnson posted ads, but Williams did not. Williams helped Johnson by getting the hotel rooms because Johnson did not want to put the rooms in his name. Williams just got the hotel rooms, partied, and sat in the car and slept.

Two expert witnesses testified on the subject of human trafficking and the psychological effects of commercial sexual exploitation on children. Desiree Thompson, a senior investigator for the Santa Clara County District Attorney's Office testified as an

14

expert on pimping, pandering, and sex trafficking. She described how prostitution in the region had evolved to have both an online and street presence. Thompson opined as to those "specific characteristics" of sex trafficking victims and their exploiters that make it easier for traffickers to target and manipulate the victims. Dr. Dawn Blacker, a clinical psychologist, testified as an expert in trauma and the psychological effects of human sex trafficking on children. Dr. Blacker described trauma and "disassociation," how it can affect a child's memory of events, vulnerability factors that may make some youth vulnerable to sexual exploitation, and psychological coercion.

Neither Johnson nor Williams presented evidence at trial.

## II. DISCUSSION

Johnson and Williams raise 10 claims of error, jointly and separately.

Johnson and Williams jointly argue: (1) there is insufficient evidence to support the jury's true finding that they used coercion in causing A. to engage in sex trafficking; (2) trial counsel was ineffective for failing to object to what they characterize as inadmissible criminal profile evidence, including expert testimony which suggested they were guilty because they acted in a manner consistent with the profile evidence; (3) the use of racially discriminatory language, including the term " 'gorilla pimp,' " by one of the prosecution's expert witnesses tainted their convictions, requiring reversal under the Racial Justice Act; (4) the trial court erred in admitting hearsay statements made by S.; (5) cumulative prejudice based on the various trial errors compels reversal; (6) imposition of a 15-years-to-life prison sentence constituted cruel and unusual punishment under the circumstances; (7) the matter should be remanded for resentencing due to recent changes to section 654 made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518); and (8) the matter should be remanded to vacate the criminal justice administration fee due to changes made by Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869) and modify the abstract of judgment accordingly.

15

In addition, Williams and Johnson each assert a separate claim of error. Williams argues that to the extent he may have been convicted on an aider and abettor theory of guilt, the trial court erred in instructing that mistake of age is not a defense to the charges of human trafficking a minor, pimping a minor, and pandering a minor. Johnson contends that the trial court erred in denying his motion to exclude statements made during a custodial interrogation where the detective did not honor his attempts to invoke his right to remain silent and did not obtain a new *Miranda*[14] waiver when Johnson reinitiated the interview several hours later.

A. *Sufficiency of the Evidence to Support the Coercion Finding*

Johnson contends that while the evidence in the case likely sufficed to support the jury's findings that he committed the crimes of pimping and pandering of A., the record failed to establish that he caused or induced her to engage in commercial sex acts by use of coercion, duress or threat of unlawful injury. Williams joins Johnson's claim of insufficient evidence to support the allegation for count 1 and further asserts that even if there was sufficient evidence as to Johnson, the evidence is insufficient as to Williams, who "was less involved in [A.]'s activities."

1. Additional Background

The trial court instructed the jury that Johnson and Williams were charged in count 1 with commercial sex trafficking of a minor, with the additional allegation that they used coercion to accomplish the crime. More specifically, the commercial sex trafficking count required the People to prove that defendants "caused, or induced or persuaded or attempted to induce or persuade" another person, under 18 years of age, "to engage in a commercial sex act" in violation of section 266(h), pimping. The jury was further instructed, in deciding count 1, to consider all of the circumstances, including the

---

[14] *Miranda v. Arizona* (1966) 384 U.S. 436.

other person's age and relationship to the defendant, and that neither consent nor "[b]eing mistaken about the other person's age" is a defense to this crime.

The instruction stated (as to each defendant) that if the jury found the defendant guilty of commercial sex trafficking of a minor as charged in count 1, it must decide "whether the People have proved the additional allegation that when the defendant committed that crime, he used force, fear, coercion, violence, duress, or threat of unlawful injury to the other person." The instruction defined the terms "[d]uress," "[c]oercion," and "[s]erious harm," and directed the jury to again "consider all of the circumstances, including the age of the other person and her relationship to the defendant."[15]

In closing arguments, the prosecutor argued as to count 1 that the prosecution had met its burden to prove the coercion allegation in four ways. First, the prosecutor argued that Johnson provided A. with controlled substances "to impair her judgment," enabling A. and S. to stay up at night and continue committing sex acts for money.

Second, the prosecutor argued a theory of "[d]ebt bondage," where Johnson had paid $575 for A.'s train ticket and told Detective Sohal that she had only paid him back $300, suggesting he was "utilizing this debt that she owe[d] to him to continue to get her to prostitute for him."

---

[15] The instruction on the coercion allegation to count 1 defined duress, coercion, and serious harm as follows: "Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to. [¶] Coercion includes any scheme, plan, or pattern intended to cause a person to believe that failing to perform an act would result in serious harm to or physical restraint against someone else or debt bondage or providing or facilitating the possession of any controlled substance to impair the other person's judgment. [¶] Serious harm includes any harm, either physical or nonphysical, including psychological, financial, or reputational harm that is sufficiently serious under all the circumstances to force a reasonable person of the same background and in the same circumstances to perform or to continue performing labor, services, or commercial sex acts in order to avoid that harm."

17

Third, the prosecutor argued there was evidence of a scheme, plan, or pattern intended to cause A. to believe that failing to perform an act would result in "serious harm." The prosecutor emphasized that defendants' conduct led A. to reasonably believe that "if she didn't do what [defendants] told her to do, that she would come to some harm, that she would be left on the street with no money and no way to protect and to support herself, that Mr. Johnson might become violent []? Like Williams had done. Or that she might lose a connection to Mr. Johnson that she thought she had created."

Fourth, the prosecutor argued the jury could find the allegation true based on duress by way of a direct or implied threat. The prosecutor emphasized that although A. had committed acts of prostitution before, it was "very different" under Johnson's terms, where A. just "wait[ed] for men to be sent in who can do whatever they want for the period of time that Mr. Johnson ha[d] arranged," and where Johnson "was able to do this because of the relationship he created and the fear that he created in her, that if she didn't do what he wanted, that bad things would happen."

Trial counsel for Johnson argued in closing arguments that while the jury could hold Johnson responsible for his role in paying A.'s passage to California—knowing she would repay him through prostitution—there was not enough evidence to convict him of human trafficking, let alone to find true the coercion allegation. Counsel argued, regarding coercion, that the life circumstances that led A. to use drugs at a young age and engage in prostitution could not be blamed on Johnson. Counsel contended A. was not drugged or forced to consume any substance involuntarily but was already addicted when Johnson met her, nor was she cut off from friends or access to cash or food, given that she continued to use a smart phone the entire time she was in California. Counsel emphasized that Johnson "didn't cause her to be addicted to drugs or to resort to prostitution to survive." Counsel for Williams similarly asserted that the evidence showed A. was not forcibly kidnapped or induced to prostitute with Johnson but had

18

chosen to come to California voluntarily, was a "voluntary and willing participant in the acts of prostitution" and "voluntarily" consumed the drugs and alcohol.

## 2. Legal Principles

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944 (*Powell*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *People v. Jimenez* (2019) 35 Cal.App.5th 373, 391–392.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid.*) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid.*) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

The crime of human trafficking of a minor, defined in section 236.1, subdivision (c),[16] "is violated in two circumstances: when a person, acting with the requisite intent,

---

[16] Under section 236.1, subdivision (c), "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time

(1) induces a minor to engage in a commercial sex act; or (2) attempts to induce a minor to engage in such an act." (*People v. Moses* (2020) 10 Cal.5th 893, 902 (*Moses*).) Section 236.1, subdivision (c)(2), provides for increased penalties for human trafficking of a minor "when the offense involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person."

The statute defines " '[c]oercion' " for purposes of the enhancement, in relevant part, as "a scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; . . . debt bondage; or providing and facilitating the possession of a controlled substance to a person with the intent to impair the person's judgment." (§ 236.1, subd. (h)(1).) It defines " '[s]erious harm' " to include "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor, services, or commercial sexual acts in order to avoid incurring that harm." (*Id.*, subd. (h)(8).) It also states that "[t]he total circumstances, including the age of the victim, the relationship between the victim and the trafficker or agents of the trafficker, and any handicap or disability of the victim, shall be factors to consider in determining the presence of" coercion or duress within the meaning of the provision. (*Id.*, subd. (i).)

### 3. Analysis

Johnson challenges the sufficiency of the evidence to support the coercion finding on the human trafficking count on multiple grounds. We have considered all the

---

of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [s]ection 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking." (§ 236.1, subd. (c).) In this case, as set forth above, the prosecution proceeded on a theory that defendants had induced or attempted to induce A. to engage in a commercial sex act with respect to the crime of pimping a minor under section 266h.

evidence introduced at trial in assessing this claim. Given the statutory directive to review the total circumstances and to consider the age and relationship of the trafficked person to the alleged trafficker(s), we decide that substantial evidence in the record supports the jury's determination that both Johnson's and Williams's actions to induce A. to engage or continue engaging in commercial sex acts involved coercion.

A.'s testimony and the text messages she exchanged with Johnson demonstrate that the total circumstances of her arrival in California at 14 years old, with no money or means to support herself, rendered her dependent on Williams and Johnson for shelter, food, and means to live. Williams, while drunk and high, beat A. on her first night in California. A. decided she would not stay with Williams and turned to Johnson, who immediately began to establish a relationship with her that—given her youth and life experience—led her to believe he cared about her and would take care of her needs by helping her to make money while providing her with drugs, food, and attention (partying and having sex with her). Johnson's putative care and attention also implied protection for A. from men who might hurt her, as Williams did the night they arrived in California. Yet shortly after Johnson introduced A. to his way of operating as a pimp and started working her as a prostitute, the evidence showed his demeanor shifted. A. testified that he got angry when she would ask for food, would tell her she could not leave the motel or that a date was on his way, and would make her wait for hours to eat, depending on his mood, so generally she was "really hungry."

Johnson attacks the credibility of A.'s testimony at trial. It is clear that A. lied to the police on multiple occasions. But evidence comprising cellular locational data, corresponding advertisements on Web sites such as Skip the Games, and text messages independently and together corroborated A.'s testimony regarding her relationship with Johnson. The digital evidence showed that A. was beaten on her first night in California. (Russell's testimony also corroborated this fact.) Not long after, Johnson, with Williams accompanying, took A. and S. on a rapid circuit of motel stays during which Johnson

21

required A. to be ready in the motel room at all hours for "dates" as he sent them up. He tracked the money she made and took all but a few dollars, made A. aware that women who made mistakes could get hurt (texting her " 'That get a bitch killed, OMM [On My Mama]' " and " 'I'm send that bitch to her momma. Watch.' "). On multiple occasions Johnson rejected her requests for permission to leave for food, prompting her to apologize and promise it would not happen again (texting, for example, " 'I'm sorry. It won't happen again Daddy.' ").

This evidence supported A.'s testimony that she "just obeyed" Johnson and "didn't say 'No' " because she had already seen how Williams "kicked [her] and hurt [her]" and she "wasn't gonna try [Johnson] too, because, I mean, they're related." Johnson refused to pay her phone bill until he " 'ma[d]e money back' " and told Detective Sohal during his custodial interrogation that A. still owed him money for her ticket to California. When A. sought assurance from Johnson regarding the relationship she thought they had, his response reminded her she was only there to make money, telling her " 'Bitch to hoe and get money the fuck you want bitch?' "

These facts, viewed in terms of the "total circumstances" (§ 236.1, subd. (i)), particularly in light of A.'s young age, her dependence on Johnson and Williams while in California, her misconception that her relationship with Johnson was going to be "something different" than what it became, and her fear that he would hurt her if she disobeyed or pushed too far, together serve as substantial evidence of coercion. They are facts from which the jury could have reasonably deduced that the actions taken by Johnson and Williams were intended to cause A. to believe that failure to perform the sex acts required when dates were sent to her motel room "would result in serious harm" (§ 236.1, subd. (h)(1)), whether physical or psychological (*id.*, subd. (h)(8)).

Johnson asserts there is no evidence linking his relationship with A. to the violent conduct perpetrated solely by Williams, which occurred on A.'s first day in California when Williams was drunk and high on cocaine. However, this argument ignores a key

22

aspect of the language defining "serious harm," for purposes of a coercion finding. (§ 236.1, subd. (h)(1).)  That definition addresses whether "a reasonable person of the same background and in the same circumstances" (*id.*, subd. (h)(8)) would perceive the harm as "sufficiently serious, under all the surrounding circumstances," (*ibid.*) to compel them to perform or continue performing commercial sex acts.  A. testified that she was not able to leave the motel room when she wanted and feared Johnson would become violent like Williams.  Considering that Williams delivered A. directly to Johnson upon their arrival in California, A. knew the two men were related, and Williams remained with the group throughout the circuit to Southern California, we disagree with Johnson's assertion that the jury had no logical or rational basis to impute Williams's conduct to Johnson or infer that Johnson intended Williams's conduct and continued presence to serve as an implied threat to A.

Johnson argues the record does not contain evidence of any specific use of force, fear, or threat of unlawful injury by Johnson from which a reasonable jury could have found beyond a reasonable doubt those factors were present in inducing A. to engage in commercial sex acts.  He points out that A.'s false stories and fabrications regarding, for example, defendants having kidnapped her, or Johnson having had a gun on him, and her continued reliance on aspects of the story that were contradicted by other evidence (such as her insistence that she first met Johnson in Gary, Indiana), discredited her testimony to such a degree that the evidence relied on to support the coercion finding was not " 'reasonable, credible, and of solid value.' "  (*Powell*, *supra*, 5 Cal.5th at p. 944.)  Although the appellate court " 'must accept logical inferences that the jury might have drawn from the circumstantial evidence' " (*Zamudio*, *supra*, 43 Cal.4th at p. 357), Johnson urges that this court may set aside the allegation finding based on A.'s "lack of fundamental credibility" and on inferences inevitably drawn from evidence shown to be "improbable on its face."  (*People v. Headlee* (1941) 18 Cal.2d 266, 267.)

Johnson also challenges the argument that A. was hungry or he deprived her of food by pointing to various examples in the text message evidence where he responded affirmatively to her requests for food, and other text exchanges in which he informed her that a date was arriving but did not ultimately deny her request for food. He argues that "[f]ar from showing Johnson was denying A. food, the [] evidence shows that he was doing the exact opposite" and that "he said 'yes,' not 'no,' on multiple occasions when [A.] asked to get food." Johnson contends that given the totality of the evidence presented, any inference that he was depriving A. of food, or using food, drugs, or sex as tools of coercion, is not reasonable.

We are unpersuaded by these arguments. A.'s credibility was a central issue to the defense, and the jury was fully informed of the different accounts she gave to investigators, her apparent confusion about when she met Johnson, and her insistence until trial that he had had a gun. A.'s testimony regarding her arrival in California, Williams's assault on the night they arrived, and the nature of her relationship with Johnson was substantially corroborated by other evidence in the record which was not subject to dispute. " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) So too, it was the province of the jury to interpret the text message evidence related to A.'s requests for food and Johnson's responses, to weigh A.'s testimony that Johnson began getting angry when she would ask for food and making her wait extended periods of time to eat, and to decide whether that evidence supported an inference that A.'s dependence on Johnson for fundamental requests like food and permission to leave the motel supported an inference of coercion. We " 'neither reweigh[] evidence nor reevaluate[] a witness's credibility' " (*People v. Wyatt* (2010) 48 Cal.4th 776, 781) in deciding whether substantial evidence supports the jury's determination.

24

Johnson attempts to distinguish other cases arising under section 236.1, subdivision (b), concerning deprivation or violation of " 'the personal liberty of another with the intent to effect or maintain a violation of' " section 266h and other similar provisions. He maintains that unlike violations of personal liberty such as occurred in *People v. Guyton* (2018) 20 Cal.App.5th 499, 507, where the defendant monitored the victim's movements and kept her isolated and dependent on him for her day-to-day sustenance, including food and shelter, or in *People v. Oliver* (2020) 54 Cal.App.5th 1084, 1099–1100 (*Oliver*), in which the defendant argued and used physical violence to get the victim to comply with his demands to prostitute herself every day, here the evidence failed to establish coercion in the form of a "scheme, plan, or pattern intended to cause" A. to believe she would suffer "serious harm" as defined by the statute, if she refused to perform or continue to perform commercial sex acts. (§ 236.1, subd. (h)(1).)

" 'Coercion' " as defined in section 236.1, subdivision (h)(1) encompasses a wide range of behaviors used to induce compliance with the trafficker's demands. Just as a jury could conclude in *Oliver* that the defendant limited the young woman's freedom of movement by monitoring and tracking her and using physical violence to gain her compliance (*Oliver*, *supra*, 54 Cal.App.5th at pp. 1099–1100), the jury in this case could have logically inferred based on the text messages between A. and Johnson, as well as her demeanor and statements to police on May 26 and her prior experience with Williams, that A. was afraid to upset or unbalance Johnson because he would become angry, would refuse to get her food and cause her to suffer from hunger and drug cravings, or would withdraw any purported emotional support or protection. Johnson's assertion that A. "was a willing participant in the enterprise from the outset" and "had engaged in similar conduct long before she ever met Johnson" is both legally irrelevant, insofar as it suggests the relevance of consent to perform commercial sex acts (§ 236.1, subd. (e)), and factually undermined by A.'s testimony that she was afraid to disobey Johnson.

25

The pattern of treatment by Johnson and Williams supported a conclusion that A. was induced to prostitute for Johnson because she feared " '[s]erious harm' " at one or both their hands, as would "compel a reasonable person of the same background and in the same circumstances" (i.e., a 14 year old with no resources, no connection to the state, and no local friends) "to perform or to continue performing labor, services, or commercial sexual acts in order to avoid incurring that harm." (§ 236.1, subd. (h)(8).)

What is more, the evidence established that Johnson supplied A. with cocaine, alcohol, and marijuana, so that she was "always on drugs." Although A. testified she previously struggled with substance abuse and used ecstasy and marijuana, she testified she had not used alcohol in significant amounts or craved cocaine before Johnson. She testified, "before I met [Johnson], I wasn't craving to do cocaine. . . . [¶] But [he] put it around me. Like, [he] put it in my face. And we did it together. And then when I ask [him] for it, [he] get mad at me." From this evidence, the jury could have reasonably concluded that Johnson's continuous provision of controlled substances to A. was intended to impair her judgment and increase her dependence on their relationship. (§ 236.1, subd. (h)(1).) In particular, evidence that Johnson provided A. with cocaine— which was not among the substances she had previously used regularly, but which she came to crave through her use of it with him—meets the definition of coercion with respect to "providing and facilitating the possession of a controlled substance to a person with the intent to impair the person's judgment." (*Ibid.*)

Johnson argues that there is insufficient evidence to prove that he provided controlled substances to A. with the coercive intent "to impair [her] judgment" so she would perform commercial sex acts. The record, however, demonstrates there was substantial evidence to support a jury finding on that basis. Williams gave A. an ecstasy pill the night they met outside the hotel room in Indiana and before he offered to bring her to California. Johnson gave A. "cocaine, weed, and ecstasy" and they drank and partied for several days before he began leaving her in hotel rooms with S. to observe and

26

then engage in prostitution. Johnson continued to supply A. with alcohol and other substances even up to the day she sought help from the police. The relevant statutory provision does not require that the prosecution prove the trafficker drugged the victim involuntarily or that she became so impaired that she could not make a conscious decision about whether to engage in sex acts for money. Rather, the statute defines " '[c]oercion' " in part as "providing and facilitating the possession of a controlled substance to a person with the intent to impair the person's judgment." (§ 236.1, subd. (h)(1).) There is ample evidence of that conduct here, as set out above.[17]

We also conclude substantial evidence supports the jury's finding as to Williams. As set forth above, Williams had a primary role in delivering A. to Johnson. He was present throughout the events in Southern California, and his physical attack on A. the night they arrived in California instilled fear in her that operated coercively to keep her from testing Johnson or trying to push him to his limit. Further, Williams texted directly with A. about her prostitution. In one exchange on April 27, Williams texted A.: " 'Where you at' " and " 'You fuck my cuz.' [¶] . . . [¶] You better have some money. Not know [*sic*] wet ass." The implied threat in this text, along with Williams's prior violence against A., provide substantial evidence from which the jury could infer coercion.

---

[17] Johnson also challenges the sufficiency of the evidence to support the theory of coercion by "debt bondage," as presented by the prosecutor in closing arguments. He argues that his statement that A. had repaid him only $300 of the $575 he had paid for her train ticket fails to show he was using A.'s purported indebtedness as a means of coercion. We recognize that the debt bondage theory, which appears to be based on Johnson's statement regarding repayment, the text message indicating he would pay A.'s phone bill once he " 'ma[d]e money back,' " and evidence that A. gave him all but a dollar or two of the money she earned, was less developed at trial. However, because substantial evidence in the record supports the jury's finding on the allegation under other theories of coercion set out in section 236.1, subdivision (c)(2), and nothing in the record suggests that the jury relied on the debt bondage theory, we need not decide whether the evidence in the record also supported a finding of coercion on this ground. (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

In short, the total circumstances and sum of evidence presented, including A.'s testimony and evidence extracted from the group's cell phones and text messages, amply support the jury's finding of coercion.

### B. *Admission of Criminal Profile Evidence*

Evidence Code section 1107.5 allows the admission of expert testimony to assist the jury in understanding the "effects of human trafficking" on victims. Williams contends his trial counsel was ineffective for failing to object to portions of the expert testimony which he claims constituted inadmissible criminal profile evidence that falls outside the scope of Evidence Code section 1107.5. He also argues that some of investigator Thompson's testimony, such as the assertion that the term " 'folks' " is used only in the human trafficking context, was beyond the scope of her expertise.

Williams maintains that, rather than helping the jury understand the behavior of the victim, the evidence suggested defendants were guilty because they acted in a manner consistent with certain categories of typified "pimp" behavior and which aggravated implicit biases and reinforced prejudices of a "stereotypical Black pimp victimizing innocent and vulnerable, often [W]hite, young victims." Williams asserts that the prosecution relied on Thompson's and Dr. Blacker's testimony to link him to the stereotypical portrait of a sex trafficker, which given the race of both defendants and of A. in this case, and the attenuated nature of his involvement with A., stemmed from a racial trope and influenced the verdict.

Johnson joins Williams's claim of ineffective assistance of counsel, arguing that the objectionable expert testimony pertained equally to both defendants and that his trial counsel could not have had a tactical reason for failing to object to the evidence.

### 1. Additional Background

The prosecution moved in limine to admit under Evidence Code section 1107.5 the expert testimony of Dr. Blacker about the psychological effects of human trafficking on its victims. The prosecutor argued that similar to the admission of Child Sexual

28

Abuse Accommodation Syndrome (CSAAS) in molestation cases, Dr. Blacker's testimony was necessary to counteract common misconceptions about how a human trafficking victim might respond to opportunities to seek help or call 911.

The prosecution also moved to admit the expert testimony of district attorney investigator Thompson regarding the mechanics, terminology, and culture of pimping, pandering, and sex trafficking, which the prosecutor argued was necessary to explain the terms and abbreviations used in text messages in the case and for the jury to understand the features of a sex trafficking enterprise and participant roles.

With respect to both motions, the prosecutor emphasized that the experts would not offer case specific opinions about whether defendants were pimps or about A.'s credibility and conduct as a victim  The trial court reiterated at a pretrial hearing that there was "a limit" with respect to any expert witness testifying as to the ultimate facts in the case.  Neither defense counsel objected to the admission of this testimony.  Nor did the trial court provide the jury with any special instructions regarding the use of expert testimony admitted under Evidence Code section 1107.5.

> a.  Thompson

Thompson testified as an expert on pimping, pandering, and sex trafficking.  As a senior investigator with the Santa Clara County District Attorney's Office and former member of the Santa Clara County Human Trafficking Task Force, Thompson worked with the sexual exploitation team, including undercover, to locate and recover victims of human trafficking and to remove exploiters from the local community.

Thompson provided background about human sex trafficking in the San Jose area and the proliferation of Web sites and online prostitution.  She opined that "sex trafficking is a predatory crime in that the exploiters . . . are looking for specific characteristics" which make it easier to target and manipulate the victims.  Those characteristics include unstable housing, a lack of parental support or other resources, and

drug addiction. Young people's tendency to post information on social media about their struggles in these areas makes it easier for predators to identify them.

Thompson discussed the terminology that sex trafficking victims use to describe their pimps. A "boyfriend-girlfriend" pimp refers to a relationship that looks like a dating relationship; the victims often believe they are "just bringing money to the relationship" and do not realize they are being exploited. A "Romeo pimp" uses charm and finesse to lure their victims, and a "gorilla pimp" uses violence to enforce compliance. Thompson opined that the typologies are "not mutually exclusive" and victims often describe their pimps as having morphed from one type to another. For example, a girl might say, " 'He[] started off as a Romeo pimp, and I was – I believed him. I thought he was awesome. And then he switched into a gorilla pimp. That's how I knew him.' " Or, a girl might warn another, " 'Hey, if you go with him, he's a gorilla pimp.' "

Thompson explained that the critical feature of the relationship, whether it is "boyfriend-girlfriend," "Romeo," or "gorilla," is "power and control." The pimp "must have power and control over his prostitute because she is the commodity. She is the one that is bringing in the income. . . . If he loses control, his commodity is gone." Common methods of control include monopolizing the victim's time, demanding the victim make a certain amount of money or complete a number of dates in order to get access to their cell phone or a meal, removing the victim from their support system if that exists, and making them solely dependent on the pimp for food, money, and outside communication. A pimp may also use gifts and small treats to continue to maintain control. There tends to be about a two-week time frame from the start of contact with the victim during which the pimp is "really, really nice" to the victim. He may use that time to learn about the victim and her weaknesses and to "put[] his hooks into the victimized." Pimps often will have sex with their prostitutes to "test their commodity" and know what they are putting on the market and what they can charge.

Drug or alcohol addiction makes it easier for the pimp to exert control over the victim because he becomes her supplier and can use the drugs or alcohol as a manipulation tool. If a victim is not yet addicted, it is in the interest of the trafficker to "get her addicted to drugs for that same reason." Drugs may also be used to "kind of knock her out" because the prostitute may not want to go to a particular city or participate in a particular sex act.

Thompson opined that youth is "a hot commodity on the [sex trafficking] market." A pimp can charge more for a juvenile, who also promises more "longevity" than an older prostitute. Thompson explained that in contrast with a drug dealer who must continue resupplying the drugs being sold, a person, especially if they're young, can be sold "every day, day in and day out. You don't have to remake the drugs." It can be very difficult for a young person tied to a pimp to walk away, as the pimp may be the only source of food, shelter, money, and support, and the child may have been shunned or removed from the family and afraid of the stigma attached to what they have been doing.

Thompson defined common terms in the sex trafficking world. To "be in pocket" means the prostitute is following the rules of her pimp, which she is given when she comes into the "family" or "stable." (A pimp has a "stable" of prostitutes). A prostitute who is "out of pocket" may face repercussions like being beaten, deprived of food, or even killed. On the street, the world of pimping and pandering is called " 'the game.' " Pimps and prostitutes use familial terms for each other. Usually, the pimp is " 'daddy' " and prostitutes refer to each other as " 'folks' " or " 'wifeys.' " The " 'bottom' " or " 'bottom bitch' " is the "top prostitute" in the stable, who either makes the most money or is the most trusted by the pimp and often regulates the other girls. Terms used in arranging commercial sex acts include, by way of example, " 'HR,' " " 'HHR,' " " 'QQ' " or " 'QK1' " followed by a number—referring, respectively, to penile-vaginal sex for one hour, one-half hour, or 15 minutes (a "quickie") followed by the price.

Thompson testified that a common prostitution circuit often includes the regions of Sacramento, San Francisco, Oakland, San Jose, then continuing to Los Angeles, San Diego, and looping back to Las Vegas and Sacramento. Moving every few days removes the prostitute from family and friends or a support system, makes the activity more difficult to track, and "refreshes the supply for the Johns [prostitution customers] in the region."

Thompson identified the most popular prostitution Web sites at the time, which included, among others, Skip the Games and Plenty of Fish. Web site ads often include a picture of the girl, somewhat "innocuous text," and a phone number, which based on Thompson's undercover experience usually connects the person paying for sexual services with the prostitute's pimp. Prospective customers commonly ask for a picture of the girl doing something specific, like holding up a certain number of fingers, to verify the photograph in the ad is actually the prostitute they will meet. According to Thompson, "[a]nyone" using possibly only an e-mail address can post an ad on many of the Web sites.

Pimps might work together in a hierarchical way with a "head" pimp. Or they may be together in one location for safety purposes, with a lookout to notify the pimp managing the girl in the room when a customer arrives or if there is law enforcement nearby. A pimp will not generally hang around and help another without getting something in return.

b. Dr. Blacker

Dr. Dawn Blacker, a clinical psychologist at the University of California, Davis, Children's Hospital, testified about the impact of trauma and the psychological effects of human sex trafficking on children. Dr. Blacker testified that "CSEC" refers to the federal definition of " 'commercially sexually exploited children' " or " 'commercial[] sexual exploitation of children.' " The adoption of the CSEC definition marked a shift in

32

treatment of commercial sexual exploitation of children and minors to make clear that minors involved in sex trafficking are viewed not as criminals but as victims.

Dr. Blacker described a framework for understanding trauma using the "three e's"—events, experiences, and effects. This framework recognizes there are traumatic events that present a physical or emotional threat, such as child sexual abuse, physical abuse, domestic violence, or sexual exploitation. A child's experience of the event or events varies based on their personal history and other factors. Finally, the effects of the trauma are what the clinician sees presenting as symptoms or behaviors that have resulted from the experience of the trauma.

Dr. Blacker testified that while an acute trauma occurs only once, chronic trauma is experienced repeatedly over time. Exposure to chronic traumatic events can result in complex trauma, or complex posttraumatic stress disorder, which may present as a combination of interpersonal difficulties, disregulation of emotion and behaviors like cutting or suicide attempt, and a pervasive negative sense of self and the world. When exposed to trauma, the typical responses are to fight, flee, or freeze. For a child trapped in an abusive situation, the adaptive response is to freeze or shut down. Traumatic events can impair memory or cause the memories to be very fragmented or disorganized.

The acronym S.T.R.E.A.M., which stands for " 'survival,' " " 'trafficker,' " " 'recruiter,' " " 'environment,' " " 'abuse,' " and " 'media,' " helps to conceptualize the ways a youth may be influenced into sex trafficking. Often, a young person gets involved in sex trafficking for survival. Dr. Blacker opined that minors who lack a supportive home life or resources are vulnerable to sexual exploitation and trafficking because they can exchange sex to meet physical needs like drugs, food, shelter, and money. They may also seek to meet their psychological need to have someone take care of them and protect them, and for love and security. A trafficker may coerce the youth to participate, or a recruiter may befriend the youth and bring them in. Social media, sexual abuse, and other environmental factors, including if other family or community members

33

are involved in sex trafficking, all present additional ways a young person may become involved in sex trafficking.  Children with a history of sexual abuse are more likely to experience sexual exploitation, and some practitioners view sexual abuse and sexual exploitation as part of the same continuum.  Additional risk factors are present for children involved in the child welfare system, homeless and runaway youth, LGBTQ youth, youth of color, and youth with emotional or intellectual disabilities.

Dr. Blacker clarified that the categories of exploiter described by Thompson as violent, Romeo, or boyfriend-girlfriend are "not distinct," and exploiters may use all of those strategies.[18]  Grooming a child for sex trafficking occurs in stages, starting with an early "romancing" stage where the exploiter uses flattery and gift buying to invoke a "real" relationship.  Next, the exploiter convinces the child that no one else can take care of them, along the lines of " 'It's just you and me.  I'm the only one that can protect you.  There's no one else that is out here for you.' "  The exploiter might test what the youth is willing to do, and finally, uses violence, coercion, and threats to maintain dependency.

Dr. Blacker testified that psychological coercion applies to sexual exploitation and trafficking of youth in that the trafficker may "monopoliz[e] the perception of the person" by getting the youth to see the trafficker as the only person who is responsible for them, isolating the youth from their peers, family members, or anyone outside the sex trafficking world, and depriving them of food or sleep, or giving them drugs, and generally reducing their ability to push back and say no.  Often, this is followed by the use of threats and physical violence, which may be mitigated by "occasional indulgences" or rewards, like a fancy dinner, getting their nails done, or even an affectionate gesture.  The trafficker also degrades the victim, enforcing trivial demands and communicating that " 'this is the only thing you're good for.' "  Substance abuse may also play a role, where a youth who is already using drugs is exploited in exchange for

---

[18] Dr. Blacker did not use the term "gorilla pimp."

drugs because of their addiction. Youth are sometimes given stimulant-type drugs like cocaine and methamphetamine to keep them up at night so they can perform sexual acts, then may be given other drugs to help them come down in the daytime. Drug use may be reinforced to help numb the youth to the numerous sex acts they have to perform.

Dr. Blacker testified that a major misconception about exploited youth is that, on some level, it appears they are choosing to engage in the behavior and are actively participating in performing sexual acts. She opined that while some youth may feel they have a choice, they rarely do. Most trafficked youth start very young and have been subject to the described vulnerabilities and psychological coercion. They may not see themselves as victims and may take on the culture of trafficking where "the game" becomes part of their identity. They may remain with their traffickers and not run away at the first opportunity. The reasons for this are complex and may depend on the dynamic of the relationship, like feelings of attachment for their exploiter, even in the context of being abused. They may have adopted a core belief that because they were sexually abused or exploited as a child they " 'might as well get money for it,' " that life in the game is exciting and life outside is " 'boring,' " or that this is all they know how to do so they " 'might as well just make the most of it.' " These types of core beliefs or identity disturbances benefit the traffickers, who may repeat and reinforce those beliefs. Also, often when youth try to leave, they may be physically harmed.

### 2. Legal Principles

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) An ineffective assistance of counsel

claim fails if the defendant cannot establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The defendant bears the burden of demonstrating by a preponderance of the evidence that his counsel's performance fell below an objective standard of reasonableness. (*In re Thomas* (2006) 37 Cal.4th 1249, 1257.) A "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746 (*Ledesma*).) Further, "[f]ailure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90 (*Bradley*).)

The test for ineffective assistance of counsel is a demanding one. (*People v. Acosta* (2018) 28 Cal.App.5th 701, 706.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) As this court explained in *Acosta*, this is a particularly difficult showing to make on direct appeal, where we are limited to the record from the trial court. (*Acosta*, at p. 706.) "The appellate record . . . rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) " 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell

within the wide range of professional competence." ' " (*Ibid*.) " 'If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected . . . "unless there simply could be no satisfactory explanation." ' " (*Ibid*.)

### 3. Analysis

" 'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801).' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) An expert's opinion is admissible if it relates "to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Expert opinion testimony is not objectionable simply "because it embraces the ultimate issue to be decided by the trier of fact" (*id.*, § 805), though " ' "[a] witness may not express an opinion on a defendant's guilt." ' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 493 (*Leonard*), quoting *Vang*, at p. 1048.)

In legislation enacted in 2016, the Legislature authorized the admission of expert testimony in a criminal action regarding the effect of human trafficking on human trafficking victims. (Evid. Code, § 1107.5; see Stats. 2016, c. 636 (Assembly Bill No. 1761), eff. Jan. 1, 2017.) "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding the effects of human trafficking on human trafficking victims, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of human trafficking victims." (Evid. Code, § 1107.5, subd. (a).) The statute provides that there is sufficient foundation for admission of this expert testimony "if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness." (*Id.*, subd. (b).) It defines " 'human trafficking victim' " consistent with section 236.1 and clarifies that it is intended only as a rule of evidence. (*Id.*, subds. (c), (d).)

37

While we generally review a trial court's decision to admit expert testimony for abuse of discretion (*People v. Prince* (2007) 40 Cal.4th 1179, 1222 (*Prince*)), we focus here on Williams's claim that his counsel's failure to object to the testimony was deficient because the evidence, as related to the culture, lingo, and mechanisms of human trafficking, was both inadmissible and prejudicial.

Williams contends that the testimony of both experts, especially Thompson, exceeded the scope of admissibility under Evidence Code sections 801, 805, and 1107.5. He asserts that instead of solely addressing topics that come under those Evidence Code sections, like the culture of human sex trafficking, common terminology and shorthand, and factors affecting the behavior of sex trafficking victims, the prosecution elicited testimony profiling traffickers as exploiters and predators who target and victimize youth for prostitution. Specifically, Williams points to testimony that traffickers view prostitutes as being in a " 'stable' " and young prostitutes as " 'commodities,' " that a pimp fulfills one of three roles ("boyfriend," "Romeo," " 'gorilla' "), uses certain grooming techniques to create the illusion of a caring relationship for the first two weeks, uses the term " 'folks' " to refer to others engaged in sex trafficking, travels in a circuit, and uses manipulative tactics like controlling access to food, drugs, and outside communication, as well as violence, threats, and psychological coercion. He also contends that certain testimony was beyond the scope of the experts' expertise, including Dr. Blacker's testimony that the coercion present in human sex trafficking is similar to that experienced in cults, and testimony by Thompson concerning use of the word " 'folks.' "

Williams contends that none of this evidence helped to disabuse the jury of misconceptions about how a victim of human trafficking behaves, but instead encouraged the jury to find defendants guilty because they fit the profile of a so-called "typical" human sex trafficker. He asserts the evidence was prejudicial because far from addressing common misconceptions, it portrayed the two, Black defendants as

"exploiters" or "predators" whose use of charm, violence, or some combination to lure a young White victim followed a similar pattern of conduct as the human traffickers described in the expert testimony. Williams further argues that Thompson's language describing " 'gorilla' " pimps controlling a " 'stable' " of young victims played on the implicit biases of the jurors based on the historically inaccurate yet stereotypical portrayal of primarily Black pimps victimizing young, vulnerable White females. Johnson joins Williams's ineffective assistance of counsel claim, arguing the prosecution relied on racially charged expert testimony to secure his conviction.

We reject Williams's ineffective assistance claim with respect to the issue of criminal profiling.[19] More than once, the California Supreme Court has explained " 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; accord *Mai*, *supra*, 57 Cal.4th at p. 1009.)

We cannot say, on the record before us, that there is no satisfactory explanation for defense counsel's failure to object to the expert testimony, which largely conformed to the prosecution's proffer in pretrial discussions and according to which the trial court ruled the testimony admissible. During those discussions, the prosecutor argued it was "critical that the jury understand something about how such enterprises function, the roles of the various players, and the commonly seen evidence of a pimp's involvement and influence, so that the jury can correctly identify the relevant evidence and the significance of that evidence." The prosecutor specified that she would not ask the expert to opine about the ultimate facts, including "whether the defendants are pimps, what types of

---

[19] We examine Williams's assertions of racial and implicit bias in more detail in our discussion of defendants' Racial Justice Act claims, *post* (part II.C.).

pimps they are, or whether the evidence as a whole indicates that they were engaging in the act of pimping."  The trial court agreed with this proposed limit.

At trial, consistent with the motion in limine, the prosecutor elicited testimony about tactics commonly used by human sex traffickers or pimps to retain young prostitutes and keep them working but did not seek an opinion based on defendants' conduct, the facts of the case, or hypotheticals drawn from or mirroring those facts.  We do not second-guess either defense counsel's tactical decision not to object to that testimony, which came well within the scope established by the parties and trial court during motions in limine.  " 'The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' "  (*People v. Riel* (2000) 22 Cal.4th 1153, 1197 (*Riel*); see also *Ledesma*, *supra*, 39 Cal.4th at p. 746; *Strickland*, *supra*, 466 U.S. at p. 690.)

In any event, it is likely that any objection to the scope of expert testimony elicited by the prosecution would have been overruled.  (See *Bradley*, *supra*, 208 Cal.App.4th at p. 90.)  "[A]lthough ordinarily courts should not admit expert opinion testimony on topics so common that persons of ' "ordinary education could reach a conclusion as intelligently as the witness" ' [citation], experts may testify even when jurors are not 'wholly ignorant' about the subject of the testimony."  (*Prince*, *supra*,  40 Cal.4th at p. 1222.)  Here, the jurors were likely unfamiliar with sex trafficking, prostitution and pandering, how sex traffickers operate, and how individuals who become involved as prostitutes may be impacted and influenced to stay with their pimp.  "By and large, the relationship between prostitutes and pimps is not the subject of common knowledge."  (*United States v. Taylor* (9th Cir. 2001) 239 F.3d 994, 998 (*Taylor*).)

Thompson's and Dr. Blacker's testimony, which addressed terms and shorthand used by participants and customers, the "types" of pimps as perceived and described by prostitutes themselves, and features of the relationship between traffickers and victims, thus concerned topics beyond most individuals' common experience.  Williams does not

argue to the contrary. Because expert testimony on these topics was admissible as pertaining to "a subject that is sufficiently beyond common experience" such that "the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), Williams has not shown his counsel was deficient for failing to object.

Williams maintains, however, that the expert testimony exceeded the scope of admissibility by utilizing profile evidence that offered jurors a stereotypical portrayal of a "typical" pimp—and more precisely, a typical Black pimp—and was tantamount to an opinion that defendants' behavior in this case was consistent with the profile. Williams argues that even with the addition of Evidence Code section 1107.5, which permits evidence to assist the jury in understanding the psychological effects of human trafficking on its victims, that evidence may not be used to profile the defendant as guilty. He contends, citing *People v. Robbie* (2001) 92 Cal.App.4th 1075 (*Robbie*), that courts have condemned such use of profile evidence, which is distinguishable from the type of crime scene-based profile evidence deemed admissible in *Prince*, *supra*, 40 Cal.4th 1179. He further points out that just as CSAAS evidence in sexual molestation cases is used to assist the jury in understanding how a sexual assault *victim* might behave but is not admissible as evidence of the defendant's state of mind, guilty conduct, or how a sexual *abuser* might behave, so too here, evidence purporting to show how a "typical" pimp or human trafficker might behave was inadmissible.

We are not persuaded that the experts' testimony exceeded the bounds of admissible evidence intended to assist the trier of fact in understanding (1) a subject area beyond their common experience (Evid. Code, § 801, subd. (a)), and (2) the psychological and behavioral effects of human trafficking on human trafficking victims (*id.*, § 1107.5, subd. (a)).

It is unclear from the record how defense counsel might have interposed a meritorious objection to the testimony, given the express statutory recognition of the relevance and admissibility of evidence "regarding the effects of human trafficking on

human trafficking victims, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of human trafficking victims." (Evid. Code, § 1107.5, subd. (a).) Evidence demonstrating the effects of human trafficking on its victims necessarily requires an understanding of the nature of the underlying conduct and trafficker's behavior toward the victims. As noted *ante*, the nature of the relationship between the trafficker and prostitute, including the persuasive or coercive tactics that may ultimately contribute to the effects experienced by victims, falls within the terms of Evidence Code section 1107.5, subdivision (a) and is unlikely to be common knowledge for jurors and thus appropriate for expert testimony under Evidence Code section 801. We agree with the assessment of the Ninth Circuit that "[a] trier of fact who is in the dark about that relationship may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution." (*Taylor*, *supra*, 239 F.3d at p. 998.)

Williams acknowledges that contextualizing the behavior of human trafficking victims in relation to the trafficker's actions might be appropriate "for some evidence," so long as the evidence is used to explain the behavior of the *victim* and not as a diagnostic tool to determine if a defendant's behavior is indicative of guilt. However, he points to the limitations placed on CSAAS evidence, as well as on evidence made admissible by Evidence Code section 1107, concerning intimate partner violence and its effects, as support for his argument that both Thompson's and Dr. Blacker's opinions exceeded these appropriate limits.

It is well-settled that CSAAS evidence or similar evidence may be admitted when relevant to some issue apart from whether the defendant committed the charged offense. (See, e.g., *People v. Bledsoe* (1984) 36 Cal.3d 236, 251; *People v. Gadlin* (2000) 78 Cal.App.4th 587, 592; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 171.)

For the reasons set forth in these cases, we do not question that expert testimony generally describing the methods and effects of human trafficking may not be admitted

42

for the purpose of proving the charged offenses or characterizing the defendant's conduct or disposition. Indeed, in a case involving pimping and pandering charges, the Fourth District Court of Appeal, Division 1, disapproved expert testimony in which the detective not only described "the ways pimps control the prostitutes who work for them" but also opined " 'as to what type of pimp' " the defendant was, stating " '[i]t started out in the beginning as a finesse pimp in their relationship, and it easily developed into a gorilla pimping relationship.' " (*Leonard*, *supra*, 228 Cal.App.4th at p. 492.) The Court of Appeal reasoned that the expert testimony categorizing the defendant as a "type of pimp" and associated " 'patterns of behavior in pimping' " (*id.* at p. 493) "could reasonably be interpreted as unhelpful comments on [the defendant]'s guilt or innocence." (*Ibid.*) Though the court in *Leonard* ultimately deemed any error harmless given the remaining evidence against the defendant, it assumed the trial court abused its discretion in admitting the testimony.[20] (*Id.* at pp. 493–494.)

Accepting that expert testimony admitted under Evidence Code section 1107.5 may not include characterizations of the defendant's conduct, guilt, or innocence, however, does little to clarify the precise boundaries for evidence admitted under the statute. Nor does Evidence Code section 1107, concerning the admissibility of expert testimony regarding "battered women's syndrome" in intimate partner violence cases, offer any definitive support, especially considering the statutory texts diverge—a point neither party has examined in any detail.[21] Based on the language of Evidence Code

---

[20] We note that *Leonard*, *supra*, 228 Cal.App.4th 465, predated by several years the enactment of Evidence Code section 1107.5.

[21] The Attorney General suggests that Evidence Code section 1107.5 tracks the language of Evidence Code section 1107, and Williams, in his reply brief, appears to agree. Because the issue is not squarely before us, we decline to address whether or to what extent expert testimony under each statute is identical in scope. We note, however, that inasmuch as Evidence Code section 1107.5, subdivision (a), uses similar language as Evidence Code section 1107, subdivision (a), to describe the admissibility of expert testimony regarding the "effects" of the subject offense on the victim, it does not mirror

43

section 1107.5, subdivision (a), and on the criteria under Evidence Code section 801 for admitting expert testimony to assist the jury as trier of fact, we decide that expert testimony concerning the effects of human trafficking on trafficking victims may properly include the context created in part by the sex trafficker. Because it appears from the record that Thompson's and Dr. Blacker's testimony fell within this framework, trial counsel was not ineffective for failing to object. Even if we were to assume that Williams could have objected to select portions of the testimony, the failure to do so does not establish ineffective assistance. (See *Riel*, *supra*, 22 Cal.4th at p. 1197.)

We also reject Williams's contention that the expert testimony here amounted to "profile evidence." "A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*Prince*, *supra*, 40 Cal.4th at p. 1226.) Profile evidence may be described as " 'a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity.' " (*Robbie*, *supra*, 92 Cal.App.4th at p. 1084.) A frequently cited example is that of the drug courier profile, which courts have held to be " ' "inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers. . . . Every defendant has a right to be tried based on the evidence against him or her, not on the techniques utilized by law enforcement officials in investigating criminal activity." ' " (*Ibid.*, quoting *United States v. Beltran–Rios* (9th Cir.1989) 878 F.2d 1208, 1210.)

---

the secondary part of Evidence Code section 1107, subdivision (a), which excepts from admissibility the testimony "when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).)

The California Supreme Court has clarified, however, that "profile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' [Citation.] In sum, 'profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt.' " (*Prince*, *supra*, 40 Cal.4th at p. 1226.) "By contrast, background testimony is not 'profile' evidence and does not specifically address the guilt or innocence of the defendant. Instead, it enables the jury to understand other evidence that does address guilt or innocence." (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1556 (*Lopez*).)

For example, in *Robbie*, the Court of Appeal held that the expert testimony of a Department of Justice special agent on whether conduct by the defendant was consistent with that of a sex offender violated the proscription against profile evidence. (*Robbie*, *supra*, 92 Cal.App.4th at pp. 1081, 1084.) *Robbie* involved charges of kidnapping for sexual purposes and other sex offenses. (*Id.* at p. 1077.) Although the expert never directly opined whether the defendant was a sex offender, the prosecutor integrated the victim's description of the defendant's conduct into hypothetical questions, to which the expert responded that such behavior was the " 'most prevalent type of behavior [the expert had] seen with sex offenders.' " (*Id.* at p. 1084.) The Court of Appeal ruled this evidence was inadmissible profile evidence. It reasoned that "profile evidence is inherently prejudicial because it requires the jury to accept an erroneous starting point in its consideration of the evidence." (*Id.* at p. 1085.) The Court of Appeal explained that the syllogism underlying profile evidence—namely, "criminals act in a certain way; the defendant acted that way; therefore, the defendant is a criminal"—is flawed because the major premise, that "criminals act in a certain way," implies that only criminals act in a given way, when in fact certain behavior may be consistent with both innocent and illegal behavior. (*Ibid.*) The court concluded that such profile evidence invites a jury to

45

improperly infer guilt based on the defendant's "match" (*ibid.*) with the profile provided, rather than disabuse the jury of misconceptions about any one typical offender. (*Id.* at pp. 1086–1087; cf. *People v. McAlpin* (1991) 53 Cal.3d 1289, 1302 [upholding admission of expert testimony that "there is no profile of a 'typical' child molester" as appropriate to refute stereotypes likely held by jurors about men who molest children].)

Similarly, in another case relied on by Williams, the defendant was a mother accused of killing her baby. (*People v. Yang* (2021) 67 Cal.App.5th 1 (*Yang*).) Although the defendant was not diagnosed with a postpartum mental disorder, the prosecution presented expert testimony which described the risk factors of certain mothers to develop postpartum depression and psychosis—disorders associated with a significantly increased propensity of the mother to think about harming the child. (*Id.* at pp. 40–41.) The appellate court decided the trial court erred in admitting the evidence, the effect of which "was to invite the jury to apply these risk factors to defendant's character traits and find she was more likely to develop postpartum depression and psychosis, and consequently was more likely to kill her daughter." (*Id.* at p. 40.)

By contrast, in *Prince*, the defendant was convicted of six counts of first-degree murder and other serious crimes. (*Prince*, *supra*, 40 Cal.4th at p. 1189.) On appeal, the defendant challenged the admission of testimony of an FBI special agent who opined, based on his experience comparing the records of hundreds of crime scenes, that common marks among the six charged homicides indicated the crimes were committed by the same person. (*Id.* at p. 1219.) The California Supreme Court rejected the defendant's attempt to analogize the testimony to improper " 'profile' " evidence. (*Id.* at p. 1226.) It reasoned that unlike profile evidence, " 'which attempts to link general characteristics of [the offender] to specific characteristics *of the defendant*' " (*ibid.*), the special agent's expert testimony "did not evaluate *defendant's* behavior against a pattern or profile." (*Ibid.*)

Williams contends that Thompson's and Dr. Blacker's testimony served the same improper purpose condemned in *Robbie* and *Yang*. He argues that Thompson's depiction of a trafficker as someone who exercises power and control over the prostitute through a set of rules, who might withhold food, supply or withhold drugs, and who is called " 'daddy' " and uses terms like " 'folk,' " invited the jury to use these characteristics as a litmus test for whether defendants were guilty, just as Dr. Blacker's testimony about the " 'exploiter' " using varied tactics to groom and test a youth was "tantamount to an opinion that the defendants were guilty."

We disagree. Neither expert witness in this case evaluated Williams's or Johnson's behavior, whether standing alone or against the profiles discussed by the experts. (Cf. *Prince*, *supra*, 40 Cal.4th at p. 1226.) Dr. Blacker testified that she knew nothing about the facts of the case. Thompson had reviewed some of the police reports and evidence in the case but testified only generally based on her experience working in law enforcement on the issue of human sex trafficking.

Furthermore, while both experts characterized certain practices as common to individuals engaged in human trafficking or pimping and pandering activities, those descriptions were not derived from the evidence in the case. Williams argues that "[t]estimony that the defendant was 'grooming' the complaining witness was inadmissible for several reasons," including that it amounted to an opinion of the defendant's guilt and that it was impermissible expert opinion of the defendant's mental state. This argument misstates the record in an important way: neither expert characterized either defendant's behavior. Dr. Blacker's testimony about the progression and stages of "grooming" a youth for sex work was based on her clinical experience and training. Whereas in *Robbie*, the prosecutor presented the expert with a series of hypothetical questions based on the alleged behavior of the defendant (*Robbie*, *supra*, 92 Cal.App.4th at p. 1084) and the expert created a profile of "an offender whose behavioral pattern exactly matched the defendant's" (*id.* at p. 1087), the record here does not reflect

any manufactured integration of the defendants' specific characteristics or behaviors into the questions posed to the experts.

This case is also distinguishable from *Yang*, where there was no "credible foundation for determining [the] defendant suffered from a postpartum mental disorder, [yet] the jury was invited to find defendant was more likely to develop postpartum psychosis in part due to her ethnicity, introverted personality, and socioeconomic status." (*Yang*, *supra*, 67 Cal.App.5th at p. 43.) The court in *Yang* observed that "[w]ithout their application to [the] defendant, these character traits . . . were irrelevant." (*Id.* at p. 40.) Here, the purported profile evidence was by no means irrelevant absent application to the defendants because, as discussed *ante*, it provided appropriate contextual information to assist the jurors in understanding the evidentiary record and assessing A.'s credibility. (See *Lopez*, *supra*, 21 Cal.App.4th at pp. 1555–1556.)

Williams also contends that his counsel should have objected to testimony by Thompson and Dr. Blacker, which he asserts the experts were not qualified to give. With respect to Thompson, Williams claims that she opined that only pimps and prostitutes call each other " 'folks' " and that the term is not used in other contexts. Based on our review of the transcript, however, including Thompson's cross-examination during which Williams's counsel pressed Thompson on other uses of the term " 'folk,' " that characterization of Thompson's testimony is inaccurate. Thompson indicated only that in the organized crime rings she had investigated, she "ha[d] not seen that term used but for human trafficking." Thompson did not broadly assert that the term was not used in other contexts and acknowledged that " 'folks' " was simply a colloquial term for family. Because Thompson was qualified to identify the context in which she was familiar with the term, an objection on the ground she was not qualified to discuss use of the term " 'folks' " in the human trafficking context would have been without merit.

As for Dr. Blacker, Williams contends that trial counsel was deficient for failing to object to that aspect of her testimony concerning psychological coercion, in which she

48

noted that some members of her field had taken the concept from other applications such as cults and applied it to the concept of coercion in sex trafficking. Williams argues that Dr. Blacker's opinion that "human traffickers were coercive in a way similar to cult leaders" was beyond the scope of her expertise. However, Dr. Blacker's references to cults were limited to (1) explaining that the concept of psychological coercion in sex trafficking was derived from other contexts, including cults, (2) noting that similar to people in cults, youth involved in sex trafficking sometimes adopt the "language" and "rules" of "the game" as part of their identity, and (3) responding to trial counsel's inquiry on cross-examination as to whether the time frame in which a person is subject to a cult is relevant to psychological coercion. Given the limited nature of these references, which fail to amount to an opinion that cult leaders and sex traffickers are similar, we conclude that trial counsel's silence on the issue did not signal professional incompetence. (*Ledesma*, *supra*, 39 Cal.4th at p. 746.)

For these reasons, we cannot conclude on the record before us that trial counsel provided deficient representation to Williams or Johnson when failing to object to the expert testimony of Thompson and Dr. Blacker.

*C. Racial Justice Act Claims*

Williams contends the testimony of Thompson and Dr. Blacker was marked by racial bias and imagery. He asserts that Thompson's use of the term " 'gorilla pimp' " and evidence evoking the racist trope of a "stereotypical Black pimp" who preys on vulnerable White females tainted his conviction, requiring reversal under the Racial Justice Act itself and/or by operation of constitutional principles that mandate application of the Act to him.

The Racial Justice Act does not currently apply to Williams due to the timing of his conviction and the express nonretroactivity of the statute under current law. However, he argues this court must nevertheless apply the principles underlying the statute as a matter of equal protection and due process. He further asserts, in response to

this court's request for supplemental briefing regarding the recent passage of Assembly Bill No. 256 (2021-2022 Reg. Sess.) (Assembly Bill 256), that forthcoming amendments to the Act require its retroactive application to this case. Johnson joins Williams's claim concerning racial bias and ineffective assistance of counsel, arguing that he is similarly situated to Williams in all material respects. Johnson similarly asserts that changes to the statute, due to take effect before the appeals in these cases are final, require its direct application here.

1. <u>Additional Background</u>

During trial, the prosecution experts testified regarding both the psychological effects of human trafficking on its victims as well as the terminology and culture of pimping, pandering, and sex trafficking. As set forth in detail above, Thompson's testimony included a summation of terminology that prostitutes "use when they're describing what type of pimp that they have." According to Thompson's testimony, prostitutes describe pimps using the terms "boyfriend-girlfriend" pimp, "Romeo pimp," and "gorilla pimp."

Thompson testified that the pimp types are "not mutually exclusive" and when victims talk about their pimps they may "morph" from one type to another, though a "dominant" type usually settles in. Thompson explained that the girls "will say, you know, 'He[] started off as a Romeo pimp, and I was – I believed him. I thought he was awesome. And then he switched into a gorilla pimp. That's how I knew him.' " Or, a prostitute might warn another, " 'Hey, if you go with him, he's a gorilla pimp.' " Thompson opined that "the relationship, whether it is a boyfriend-girlfriend pimp, Romeo pimp, or a gorilla pimp, it really all boils down to power and control."

Dr. Blacker referenced the same typologies but did not use the term "gorilla pimp," instead noting that "some are mainly violent—violence—or finesse exploiters who use smooth talking and promises of luxury, so forth; Romeo or boyfriend exploiters,

50

who create a relationship romantic relationship with the youth." Like Thompson, Dr. Blacker emphasized that the types were "not distinct categories."

In closing argument, the prosecutor argued that defendants "chose" A. because she was "an easy mark, someone who had a problematic past, who had a substance abuse problem, and who didn't have a family that would come to her rescue." The prosecutor did not use the term "gorilla pimp" or suggest that either defendant fell within that category. The prosecutor discussed the experts' explanations of tactics used by traffickers to control and coerce, referencing that "here we have the evidence of a Romeo pimp," suggesting that traffickers "act knowingly and deliberately," and several times referencing Williams's "violent act" against A.

The jury reached its verdicts on November 26, 2019, finding Johnson and Williams guilty of all counts and finding the coercion allegation as to count 1 to be true. On November 5 and November 12, 2020, respectively, the trial court entered judgment on Johnson and Williams.

The Racial Justice Act took effect on January 1, 2021. On August 31, 2022, while this appeal was pending, the Legislature passed Assembly Bill 256, which, among other changes effective January 1, 2023, amends the retroactivity provision of the Racial Justice Act to authorize the filing of a petition, or prosecution of writ of habeas corpus, where judgment was entered prior to January 1, 2021. (Stats. 2022, c. 739 (Assem. Bill 256), §§ 2, 3, eff. Jan. 1, 2023.) The Governor signed Assembly Bill 256 on September 29, 2022.

## 2. Legal Principles

Effective January 1, 2021, the Racial Justice Act codified the fundamental principle that "[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) Under current law, the Act "applies only prospectively in cases in which judgment has not been entered prior to January 1, 2021." (§ 745, subd. (j); §1473, subd. (f) [providing

a writ of habeas corpus may be prosecuted for a judgment "entered on or after January 1, 2021," based on evidence of a violation of section 745, subdivision (a)].) Effective January 1, 2023, forthcoming amendments to the non-retroactivity provision render section 745 applicable to "all cases in which judgment is not final." (Stats. 2022, c. 739 (Assem. Bill 256), §§ 2, 3, eff. Jan. 1, 2023 [amending § 745, subd. (j), § 1473, subd. (f)].)

The Act outlines four categories of conduct that serve as the basis for a violation. (*Young v. Superior Court* (2022) 79 Cal.App.5th 138, 147 (*Young*).) Relevant here is the second category of conduct, described in section 745, subdivision (a)(2), as follows: "During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is describing language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) A defendant establishes a violation of the Act if, by a preponderance of the evidence, the defendant proves that an expert witness "used racially discriminatory language" or otherwise exhibited racial bias, whether or not purposeful. (*Ibid.*)

The Act defines " '[r]acially discriminatory language' " to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(3).) The forthcoming amendments to the Act further clarify that a defendant seeking to establish a violation of

subdivision (a) "does not need to prove intentional discrimination."  (Stats. 2022, c. 739 (Assem. Bill 256), § 2, eff. Jan. 1, 2023 [amending § 745, subd. (c)(2)].)

The procedure to allege a violation under the Racial Justice Act prior to entry of judgment is for the defendant to file a motion in the trial court.  (§ 745, subd. (b).)  Upon a defendant making a prima facie showing of a violation of section 745, subdivision (a), the trial court holds a hearing where either party may present evidence and the defendant has the burden of proving a violation of the Act by a preponderance of the evidence.  (*Id.*, subd. (c)(1), (2).)  If the court finds the claimed violation, the court "shall impose a remedy" from among those specified in the statute.  (*Id.*, subd. (e).)

Where, as here, judgment has already been imposed, the Act provides for the filing of "a petition for writ of habeas corpus or a motion . . . in a court of competent jurisdiction, alleging a violation of subdivision (a)."  (§ 745, subd. (b).)  Although section 1473, governing the prosecution of a writ of habeas corpus, currently reflects the prospective-only application of section 745 (see § 1473, subd. (f)), the forthcoming amendments to that section eliminate that language and instead specify that "a writ of habeas corpus may also be prosecuted after judgment has been entered based on evidence that a criminal conviction or sentence was sought, obtained, or imposed in violation of subdivision (a) of [s]ection 745, if that section applies based on the date of judgment as provided in subdivision (j) of [s]ection 745."  (Stats. 2022, c. 739 (Assem. Bill 256), § 3, eff. Jan. 1, 2023.)

The Act authorizes a set of remedies specific to postjudgment requests for relief.  (§ 745, subd. (e)(2)(A)–(B).)  The forthcoming amendments to the Act further provide that "[f]or petitions that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief as provided in subdivision (e), unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment."  (Assem. Bill 256, § 2, eff. Jan. 1, 2023 [adding § 745, subd. (k)].)

The parties agree that Williams's and Johnson's cases will not be final by January 1, 2023. Because judgment was entered in Williams's and Johnson's cases in November 2020, as of January 1, 2023, they will be entitled to seek relief under the amended statute by filing a petition for writ of habeas corpus.

### 3. Analysis

In his original briefing in this court, Williams conceded the Act as currently operative does not apply to his case, but he contended that he is nevertheless entitled to reversal under the principles embodied in the Act under equal protection and due process principles. In response to this court's request for supplemental briefing on the effect of Assembly Bill 256 on Williams's and Johnson's appeals, Williams contends that the amended statute extends application of the Act to cases which are not yet final and permits a claim under the Act to be asserted in the first instance on appeal. Williams maintains that his equal protection and due process arguments are not moot because Assembly Bill 256 articulates a new prejudice standard (§ 745, subd. (k), added by Assem. Bill 256, § 2, eff. Jan. 1, 2023), which he argues would not have applied under the original Act. Johnson joins Williams's supplemental arguments regarding the effect of Assembly Bill 256.

The Attorney General counters that even if the Racial Justice Act were currently applicable to Williams's case, there would be no violation because "this was not a trial marked by racial overtones" and the jury found Williams guilty of sex trafficking "by virtue of the overwhelming evidence of his guilt." The Attorney General maintains that neither equal protection nor due process principles require reversal of Williams's conviction. Regarding the impact of Assembly Bill 256, the Attorney General contends that although the amended statute renders the Act retroactive, it does not make Johnson's and Williams's claims subject to consideration on direct appeal because section 745, subdivision (b) states that where judgment has been imposed, a defendant may file a petition for writ of habeas corpus or motion under section 1473.7. The Attorney General

asserts that Williams and Johnson are not without a remedy, given that they may pursue relief pursuant to the amended statute by one of the two stated mechanisms for raising a claim postjudgment, as Williams has already done by concurrently seeking relief via his petitions for writ of habeas corpus.

We address Williams's constitutional arguments before turning to the merits of his Racial Justice Act claim, as framed by Assembly Bill 256.

a. Constitutional Claims

As framed in his supplemental briefing, Williams's equal protection claim focuses on the inclusion in Assembly Bill 256 of a prejudice standard for cases (like his) in which judgment has been entered.[22]  He asserts his right to equal protection under the law is violated because he may be denied relief if the state can prove beyond a reasonable doubt that a violation of the Act did not contribute to the judgment—a standard that does not appear in the Act for cases in which judgment has not yet been entered.  Under the Act as applied to prejudgment cases, a violation of the Act entitles the movant to relief without any showing of prejudice.  (See § 745, subd. (e) ["[I]f the court finds, by a preponderance of evidence, a violation of subdivision (a), the court shall impose a remedy specific to the violation found from the following list: . . . "].)

--------

[22] In his original briefing in this court, Williams contended that the prospective-only application of the Act violated equal protection principles.  In light of the recent passage of Assembly Bill 256, however, we conclude that the amendments scheduled to take effect before Williams's and Johnson's appeals are final render moot any argument that the failure to apply the Racial Justice Act retroactively is an equal protection violation.  We similarly decide that Williams's due process claim (which was based on the contention that failure to apply the principles of the Racial Justice Act to him violated his due process rights) is moot in light of Assembly Bill 256.  To the extent that Williams contends the inclusion in Assembly Bill 256 of a *Chapman*-like prejudice standard (see *Chapman v. California* (1967) 386 U.S. 18) for cases in which judgment has been entered violates his right to due process, he offers no legal authority to support the claim.  Williams has identified no fundamental substantive or procedural right at stake in the Legislature's imposition of a different prejudice standard when assigning entitlement to statutory relief for defendants seeking relief after their judgment has been entered.

55

We analyze the equal protection guarantees of the Fourteenth Amendment and the California Constitution in a similar fashion.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *People v. Leng* (1999) 71 Cal.App.4th 1, 11.)  "The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally."  (*People v. Brown* (2012) 54 Cal.4th 314, 328.)  " ' "[T]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." '  [Citation.]  'This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' "  (*Ibid*., italics omitted.)  "In other words, we ask at the threshold whether two classes that are different in some respects are sufficiently similar with respect to the laws in question to require the government to justify its differential treatment of these classes under those laws."  (*People v. McKee* (2010) 47 Cal.4th 1172, 1202 (*McKee*).)

We are not persuaded by Williams's assertion of an equal protection violation based upon the prospective application of the prejudice standard set forth in Assembly Bill 256.  Even if we assume, without deciding, that the differential standard of prejudice applicable under Assembly Bill 256 to the class of defendants seeking to establish a Racial Justice Act violation whose judgment was entered before January 1, 2021, satisfies the "sufficiently similar" inquiry at the first step of equal protection review (see *McKee*, *supra*, 47 Cal.4th at p. 1202), we do not agree that Williams has established a violation of his right to equal protection.

In making this determination, we recognize that the appropriate standard of review, or level of scrutiny, to apply to the challenged distinction "depends upon the classification involved in, and interests affected by, the challenged law."  (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42.)  "The challenged law will be subject to strict scrutiny only if operates to the peculiar disadvantage of a suspect class [citation] or

impinges on a fundamental right." (*Ibid*.)  Thus, "[u]nequal treatment based on a suspect classification such as race is subject to ' "the most exacting scrutiny" ' " (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*)), as is "treatment affecting a fundamental right." (*Ibid*.)

The inclusion of a prejudice standard for cases in which judgment has been entered neither differentiates based on a suspect classification, such as race, nor targets a fundamental right. Where the challenged disparity "implicates no suspect class or fundamental right, 'equal protection of the law is denied only where there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).)

Having determined that the newly added section 745, subdivision (k) does not burden a fundamental right, we must decide only if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." (*Heller v. Doe* (1993) 509 U.S. 312, 320.) "Neither the legitimate purpose nor the rational relationship need ever have been spelled out by legislators or other government actors who chose to make use of the classification. Instead, the rational basis of the challenged scheme need only be ' "reasonably conceivable" ' in the mind of the court reviewing it." (*People v. Son* (2020) 49 Cal.App.5th 565, 594; see also *Heller*, at p. 320.) Under rational basis review, "[i]f a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' " (*Johnson, supra*, 60 Cal.4th at p. 881.)

We decide that fiscal and administrative concerns constitute such a plausible basis. Our high court has recognized that fiscal or administrative considerations may serve as a reasonable basis for a non-suspect classification. "Preserving the government's financial integrity and resources is a legitimate state interest." (*Chatman, supra*, 4 Cal.5th at p. 290.)  In *Chatman*, the California Supreme Court considered an equal protection challenge to the statutory scheme governing the eligibility of convicted felons to seek a certificate of rehabilitation after completing a term of incarceration or probation. (*Id.* at

p. 282.)  The court acknowledged that while the "Legislature's decision to provide certificates of rehabilitation to former probationers and former prisoners serves the laudable goal of decreasing the negative effects of felony convictions for those convicted felons who have achieved rehabilitation  . . . , processing certificates of rehabilitation . . . nonetheless requires the expenditure of significant resources."  (*Id.* at p. 290.)  It ruled that the challenged classification, which involved differential eligibility requirements for former probationers and former prisoners seeking a certificate of rehabilitation, was "a rational means of preserving government resources."  (*Id.* at p. 291.)

The stated intent of the Legislature in enacting the Racial Justice Act is "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California."  (Stats. 2020, ch. 317, § 2, subd. (i).)  This purpose—no less than the task of providing certificates of rehabilitation at issue in *Chatman*—requires the "expenditure of significant resources."  (*Chatman*, *supra*, 4 Cal.5th at p. 290.)

The implementation of section 745, subdivision (a) relies upon a "somewhat complex" framework (*Young*, *supra*, 79 Cal.App.5th at p. 147) which includes rights to discovery (§ 745, subd. (d)), an evidentiary hearing following a prima facie showing (§ 745, subd. (c)), and remedies (§ 745, subd. (e)).  We may infer from the legislative record of the original Act that the costs associated with potential, retroactive implementation of the Act may have precipitated the limited application of section 745, subdivision (a) to cases in which judgment had not been entered prior to January 1,

2021.[23]  For similar reasons, the Legislature could have reasonably decided that providing that a defendant may not be entitled to relief upon establishing a section 745, subdivision (a)(1) or (2) violation if "the state proves beyond a reasonable doubt that the violation did not contribute to the judgment" (Assem. Bill 256, § 2, eff. Jan. 1, 2023 [adding § 745, subd. (k)]), was a reasonable mechanism to balance retroactive relief with the costs associated with subsequent, retroactive application of the Act.

For these reasons, we reject Williams's and Johnson's constitutional claims based on the Racial Justice Act.

b.  Statutory Application of Racial Justice Act

We turn to Williams's contention in supplemental briefing, joined by Johnson, that because Assembly Bill 256 expands the application of the Racial Justice Act to cases in which judgment is not yet final, this court can and should consider on the merits in this direct appeal defendants' section 745, subdivision (a) claim.  The Attorney General disagrees that the claim asserted under the Act is properly before the court on direct appeal and moreover argues it is without merit.

We have carefully considered the arguments, the posture and timing of both appeals, and the mechanisms identified in the statute to allege a section 745, subdivision (a) violation.  We decide that we need not definitively resolve the general question of whether a postjudgment Racial Justice Act claim can be brought on direct appeal.  On the

---

[23] According to the legislative history of the Act, shortly after the Senate Committee on Appropriations noted estimates of increased workload costs to courts "between the range of $9.3 million and $40.6 million given the prospective and retroactive application of this measure," the committee amended the bill to limit its application to cases in which judgment had not been entered prior to January 1, 2021. (*Compare* Sen. Com. on Appropriations, Analysis of Assem. Bill No. 2542 (2019-2020 Reg. Sess.) as amended Aug. 14, 2020 at p. 1, *with* Sen. Com. on Appropriations, Analysis Addendum of Assem. Bill No. 2542 (2019-2020 Reg. Sess.) as amended Aug. 20, 2020 at p. 2.)

assumption that under the circumstances of this case we can consider the statutory Racial Justice Act claim in this appeal, we deny it on the merits.[24]

The heart of Williams's claim under the Racial Justice Act is the recognition that evidence or argument that reflects racial bias or is consistent with racial stereotypes is inherently prejudicial because it increases the likelihood that the jury will convict based on stereotypes, or through the operation of implicit bias, rather than on the evidence.

Williams contends that in their testimony, Thompson and Dr. Blacker "used racially discriminatory language about the defendant's race" (§ 745, subd. (a)(2)) in violation of the Act. Williams asserts that the terms used by Thompson and Dr. Blacker—most specifically " 'gorilla' pimp," and relatedly terms like " 'exploiter,' " " 'predator,' " " 'stable' " of prostitutes, and children as " 'commodities' "—invoked animal imagery long associated with dehumanizing Black people and used to trigger commonly held stereotypes and prejudices. He argues that "[r]eferring to the behavior of a pimp who uses violence, . . . as a 'gorilla' pimp re-enforced stereotypes of Black men being violent, uncivilized[,] and not as evolved as others." He further argues that expert testimony describing pimps (and by implied extension, defendants) as " 'predatory' " " 'exploiters' " who treat prostitutes as a " 'commodity' " similarly reinforced longstanding racist stereotypes based on the portrayal of the Black man as a sexual threat who preys on White women and girls.

---

[24] Our decision to address the Racial Justice Act claim on the merits in the direct appeal is driven by the timing of the appeals in these cases in relation to the passage of the original Act and enactment of Assembly Bill 256, the issues raised and fully briefed in the appeals and in Williams's related petition and supplemental petition for writ of habeas corpus, and the lack of any factual dispute over the evidence that Williams asserts entitles him to relief. We express no opinion on the parties' competing interpretations of section 745, subdivision (b), regarding whether the statutory language is permissive or mandatory with respect to the filing of a petition for writ of habeas corpus or a motion under section 1473.7 in a court of competent jurisdiction in order to allege, after judgment has been imposed, a violation of subdivision (a) of section 745.

In support of his arguments, Williams points to the Legislature's condemnation, in the uncodified findings accompanying the Act, of the use of animal imagery or racially coded language in criminal trials. (See § 745, subd. (h)(3) [defining " '[r]acially discriminatory language' " to include "racially charged or racially coded language, language that compares the defendant to an animal"]; Stats. 2020, ch. 317, § 2, subd. (e) ["Existing precedent tolerates the use of racially incendiary or racially coded language, images, and racial stereotypes in criminal trials. . . . Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system."].) Williams cites scholarly literature examining racial bias and implicit racial bias in criminal trials and the racist origins of both academic and popular discourse on pimping and the pimp-prostitute relationship. (See, e.g., Thompson, *Bias on Trial: Toward an Open Discussion of Racial Stereotypes in the Courtroom* (2018) 2018 Mich. St. L.Rev. 1243, 1250; Butler, *The Racial Roots of Human Trafficking* (2015) 62 UCLA L.Rev. 1464, 1473, 1492; Giobbe, *An Analysis of Individual, Institutional, and Cultural Pimping* (1993) 1 Mich. J. of Gender & Law 33, 34].)

The Attorney General counters that this was "not a trial marked by racial overtones" and the only time race was mentioned was in identifying the parties—a use of race that the Attorney General submits is expressly permitted under the Act. Regarding the terminology used by Thompson and Dr. Blacker, the Attorney General disputes the testimony was explicitly racist or a trigger for implicit bias. The Attorney General asserts that both experts relied on generic language commonly used in the field of human sex trafficking (i.e., sex trafficking is a "predatory" crime, a pimp " 'put[s] his hooks into the victim . . . learn[s] . . . what her weaknesses are, what he's going to be able to exploit,' " and juveniles are " 'a hot commodity [on] the market' " due to their age and longevity). The Attorney General argues that if these terms were deemed, as a matter of law, to

61

trigger implicit bias, then many statutes using similar terminology and nearly all expert testimony in human sex trafficking cases would violate the Racial Justice Act.

The Attorney General also disputes Williams's characterization of Thompson's use of the term " 'gorilla pimp' " as racially discriminatory. The Attorney General points out that Thompson used the term only in describing how the prostitutes she has met in the course of her law enforcement work in the field of sex trafficking view and describe their relationships with pimps and the tactics pimps employ to keep the prostitutes working for them. The Attorney General argues that as used in this context, " 'gorilla pimp' " was consistent with the exception set forth in section 745, subdivision (a)(2) for " 'language used by another that is relevant to the case' " and provided helpful background for the jury to understand why a prostitute might stay with a pimp. Moreover, the Attorney General points out that neither expert related the term to either defendant in the case or sought to characterize either defendant as a violent or " 'gorilla pimp.' "

In reply, Williams contends that the Attorney General's reliance on the exception for language "used by another that is relevant to the case" (§ 745, subd. (a)(2)) is misplaced because the term was not relevant here. Williams argues that unlike the recitation of a term used by an eyewitness, or of a racially charged statement relevant to the legal claim (e.g., in a discrimination or harassment case), the term " 'gorilla' " was "simply a racially laden term that was gratuitously thrown in[]." Williams asserts that referring to a term purportedly used by others, but not actually relevant to the case, "is the nature of implicit bias" and is both highly prejudicial in a trial involving two Black defendants and a violation of the Racial Justice Act.

We recognize both the gravity of Williams's claim and the importance of addressing Williams's arguments concerning the language used by the expert witnesses in this trial. (See Stats. 2020, ch. 317, § 2, subd. (b).) We ultimately conclude, however, that on the record before us, defendants have not established that they are entitled to relief.

We disagree with Williams's characterization of certain terms used by the expert witnesses as racially laden. That this case involved two Black male defendants and a White minor victim (as well as another victim, who was Black) does not, without more, render "racially discriminatory" (§ 745, subd. (a)(2)) Thompson's and Dr. Blacker's use of terms like " 'predatory' " or " 'exploiter,' " the "grooming" of the victim, and youth as a "commodity." Williams does not offer a persuasive basis for deeming these commonly used descriptors to be racially discriminatory, nor does he point to any evidence that the experts "exhibited bias or animus towards the defendant because of the defendant's race, . . . , whether or not purposeful." (*Ibid.*)

Nevertheless, we agree that Thompson's use of the term " 'gorilla' pimp" implicates the Racial Justice Act. The term "gorilla pimp" uses animal imagery. Even when not intended as a coded racial appeal, the word " 'gorilla' " suggests racial overtones when used in a trial involving two Black defendants. Our Legislature has declared that the "use of animal imagery is historically associated with racism." (Stats. 2020, ch. 317, § 2, subd. (e).) Indeed, given the "odious historical context" (*Bennett v. Stirling* (4th Cir. 2016) 842 F.3d 319, 324) wherein Blacks "have been appallingly disparaged as primates or members of a subhuman species in some lesser state of evolution" (*id.* at p. 325), its use at trial warrants scrutiny. (*People v. Thompson* (2022) 83 Cal.5th 69, 96 [emphasizing that courts must "be vigilant" about avoiding racially coded terminology and must remind counsel and witnesses to do the same].) Thus, while we recognize that the term "gorilla pimp" appears not infrequently in cases involving pimping, pandering, and sex trafficking—both in the context of expert testimony and as used by those involved in the trafficking (see, e.g., *Moses*, *supra*, 10 Cal.5th at p. 896; *Leonard*, *supra*, 228 Cal.App.4th at p. 492; *United States v. Brinson* (10th Cir. 2014) 772

F.3d 1314, 1319; *People v. Zambia* (2011) 51 Cal.4th 965, 971 (*Zambia*)), this fact alone does not render the term neutral.[25]

At the same time, section 745, subdivision (a)(2) excepts from a violation of the Racial Justice Act circumstances in which "the person speaking is describing language used by another that is relevant to the case." (§ 745, subd. (a)(2).) The provision does not specify that the "language used by another" must be in reference to a statement made by an eyewitness in the case. The words of the statute instead suggest a broad scope for the exception based on "language used by another that is relevant," meaning it has some tendency in reason to prove or disprove any disputed fact of consequence to the determination of the action. (*Ibid.*; see Evid. Code, § 210.)

We observe that Thompson used the term " 'gorilla' pimp" four times during her testimony in the context of explaining how, in her experience as an investigator, human sex trafficking victims describe their pimps. According to the in limine motion preceding Thompson's designation as an expert on pimping, pandering, and sex trafficking, Thompson's testimony was intended to assist the jury in understanding the features of a sex trafficking enterprise and participant roles, including the terminology and culture of pimping, pandering, and sex trafficking. The recognition among the victims of known patterns of trafficking relationships—as testified to by Thompson—underscores the commonality of their subjective experience in response to the different mechanisms of inducing compliance. Under these circumstances, Thompson's effort to convey and contextualize the terms that are commonly used by human sex trafficking victims was not

---

[25] In a recent decision by the Court of Appeals of Washington, Division 3, the court reversed a conviction based on the prosecutor's introduction at trial of the concept " 'gorilla pimp.' " (*State v. McKenzie* (Wash. Ct. App. 2022) 21 Wash.App.2d 722, 723.) The court explained that in the context of that case, in which a Black man was accused of targeting a White girl for sexual exploitation and in which "[n]o witness had used this terminology and the issue of pimping had minimal relevance," the "only purpose served by referencing the gorilla pimp concept was to tap into deep-seated racial prejudice by comparing Black human beings to primates." (*Ibid.*)

merely gratuitous and was "relevant to the case" within the plain meaning of the exception to a section 745, subdivision (a) violation. (§ 745, subd. (a)(2).)

Furthermore, neither expert nor the prosecutor attempted to characterize Williams or Johnson as a "gorilla pimp" or to imply that Williams's act of violence against A. placed him within this category. As noted, the term appeared strictly in the context of Thompson providing background information, in the words of prostitutes she has met, about power and control behaviors commonly associated with pimps. Thus, while the term as it arises in the field of sex trafficking invokes animal imagery, its use in this case was not as "language that compares the defendant to an animal." (Cf. § 745, subd. (h)(3).)

We do not condone the use of the term "gorilla pimp" by the prosecution expert. We recognize on a different record this testimony might well constitute a violation of section 745, subdivision (a)(2). Indeed, the enactment of the Racial Justice Act amplifies the need not only to recognize the damaging inferences that can result from the use of animal imagery and eliminate such language from future trials, but to rectify those situations in which a criminal conviction was obtained on the basis of race. (§ 745, subds. (a), (e).)

However, we do not believe the isolated appearance of the term in the context of Thompson's testimony about language used by prostitutes to describe their pimps' behavior establishes such a violation here. The most damning evidence in the case against defendants was their own words, documented in text messages entered into evidence.[26] As the prosecutor argued to the jury in closing argument, the text messages

---

[26] For example, Johnson texted A. "Date outside hhr80." "For you." A. responded, "OK he's giving me 100 for hhr." Johnson replied "OK." "Make him nut fast." "Work his ass." A. responded "Ok, DADDY." On another occasion, Johnson sent A. a text message, "When you get sexy take some pictures and send them." Later the next day, Johnson texted A. "Tell that bitch to get up and get her self together." She replied "Ok." "Shes in tha shower." Johnson wrote, "Tell her dnt open the door for

"proved the case completely by [themselves]." The principal evidence against the defendants thus did not center on their characteristics, personalities, or "nature." Instead, the evidence focused on what occurred during the period in which A. was in California with them in the form of text messages arranging the commercial sex transactions and ensuring A.'s participation, advertisements posted for A.'s commercial sexual services in precise coordination with the movements of the group up and down the state, A.'s own communications and phone usage during this time, and on the jury's evaluation of the credibility of A.'s testimony.

For these reasons, we reject Johnson's and Williams's contentions that they are entitled to relief under the Racial Justice Act, as amended by Assembly Bill 256.

### D. Admission of Hearsay Evidence

Johnson contends the trial court erred by allowing A. to testify under the "state of mind" exception to the hearsay rule (Evid. Code, § 1250) about S.'s reasons for prostituting with Johnson. Johnson argues the exception did not apply because S.'s state of mind was not at issue and the evidence allowed the jury to draw improper inferences about Johnson's provision of drugs to A. Williams joins the claim based on erroneous admission of hearsay evidence. He argues the admission of S.'s hearsay statement was prejudicial because it was instrumental in trying to prove the coercion allegation as to

---

nobody when you come down" and "Come down and to the back and bring that money." After one transaction, A. told Johnson she had just searched the whole room and found that the client had taken her cigarettes. Johnson told her, "Bitch go get some fucking ports tf that's wat." She responded "How I have no ID." Ten minutes later, Johnson texted A. "Date be there in 15mins hr200 he 67W and he bringing you ports." She responded "Ok." Johnson later texted A. "You have date on the way in 10mins hhr160." Ten minutes later, he wrote "The date coming up now." Ten minutes later, A. texted Johnson, "he said 2 pops?" Johnson replied, "Yes only if he can in 30 mins." Johnson texted A. "After this date get yo ass dressed and she better be dressed hair done to tf." A. told Johnson she was walking to Dennys. Johnson replied "And nx time bitch dnt tell me wtf you gone do bitch. Im walking to Denny's who tf said you can just walk when tf you want bitch." A. replied "Ok I'm sorry it won't happen again DADDY."

66

count 1 based on an inference that Johnson coerced S. with drugs and must have "[b]y extension" coerced A. Williams also argues that but for S.'s hearsay statement suggesting that she was compelled to prostitute for Johnson because of her addiction, a reasonable jury might have acquitted him of counts five and six related to S., because the evidence of his role with respect to the charges concerning S. was "much more attenuated."

The Attorney General contends the trial court properly exercised its broad discretion in finding the statements S. made to A. while they shared a motel room came within the state of mind exception to the hearsay rule. The Attorney General asserts that even if the testimony should not have been admitted, any error was harmless.

### 1. Additional Background

During A.'s testimony, the prosecutor asked A. if while she was in the motel rooms with S., she ever talked to S. "about how [S.] came to be there" or "about how [S.] felt being there." Williams's counsel objected to both questions as calling for hearsay, and the trial court sustained the objections.

After a sidebar discussion out of the presence of the jury and a mid-morning recess, A.'s examination resumed. The prosecutor asked, "[A.], before we left, I asked you what[ S.]'s state of mind was like in the motel rooms. What did she tell you about how she was feeling?" A. answered, "[S]he told me that she misses her kids; she wants to see her kids; the reason why she was doing this was because she needed somewhere to go; she had nowhere to go; and she couldn't see her kids. [¶] She was also addicted to drugs. So she didn't have nobody to supply her with drugs." A. testified that S. was addicted to methamphetamine and Johnson was giving her the drugs.

The trial court later placed on the record the sidebar discussion that had occurred, noting defense counsel for both defendants objected to the prosecution eliciting evidence from A. about S.'s statement regarding her state of mind. Williams's counsel argued that the evidence should have been limited to S.'s "emotional state" and should not have

67

incorporated other concerns related to her addiction to drugs or desire to be with her family, which he believed came outside the contemplated exception. The prosecutor countered that S.'s state of mind was at issue in the case, because of the pandering charge and S.'s need for drugs provided to her by Johnson. The trial court stated that it ultimately ruled the evidence was admissible under Evidence Code section 1250. It explained, "I allowed it because I think it was appropriate to put in context the emotion, also to the extent that those emotions to [*sic*] were not based on her, blamed on either of the defendants, I thought it was appropriate for the jury to know the basis of that emotion."

## 2. Legal Principles

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) Even where relevant, evidence of an out-of-court statement made by someone other than the testifying witness and offered in court for the truth of the matter stated is generally inadmissible under the hearsay rule unless it falls under an exception. (Evid. Code, § 1200, subds. (a), (b); *People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).)

The "state of mind" exception to the hearsay rule applies to "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) . . . when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a)(1), (2)).) "A prerequisite to this exception is that the declarant's mental state or conduct be placed in issue." (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.) Furthermore, the "exception applies only to

68

statements offered to show the state of mind of the *declarant*, not the listener." (*People v. Luo* (2017) 16 Cal.App.5th 663, 677.)

We review claims of evidentiary error for abuse of discretion. (*Waidla*, *supra*, 22 Cal.4th at p. 717.) Underlying the admissibility determination are the issues of "(1) relevance, (2) hearsay rule/state-of-mind exception, and (3) undue prejudice." (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)

### 3. Analysis

Johnson's primary argument is that the trial court erred in admitting the testimony about S. because no hearsay exception applied. He argues that S.'s mental state was not material to the determination of the action or at "issue in the action" (Evid. Code, § 1250, subd. (a)(1)), and even if it were, the information that she was addicted to methamphetamine and being supplied by Johnson was not relevant to her mental state. Johnson asserts that while the applicable standard of review is abuse of discretion, the trial court's incorrect understanding or application of the state of mind hearsay exception constituted legal error. (See *People v. Patterson* (2017) 2 Cal.5th 885, 894.)

We disagree that the trial court misconstrued the nature of the exception or abused its discretion in admitting the testimony. Johnson's assertion that S.'s mental state was not at issue fails to acknowledge the broad standard of relevance, and the more particular relevance of S.'s mental state to the pandering charge and to explain her conduct in staying with Johnson and Williams. Our Supreme Court has explained the "at issue" requirement (Evid. Code, § 1250, subd. (a)(1)) as " '[a] prerequisite . . . that the declarant's mental state or conduct be factually relevant.' " (*People v. Geier* (2007) 41 Cal.4th 555, 586, overruled on other grounds as stated in *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320.) Furthermore, "[t]he trial court is vested with broad discretion in determining the admissibility of evidence." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386.)

In count 6, Johnson and Williams were charged with pandering in violation of section 266i. The trial court instructed the jury in relevant part that the People must prove that "1. The defendant arranged or procured a position for [S.] to be a prostitute in either a house of prostitution or any other place where prostitution is encouraged or allowed; [¶] and [¶] 2. The defendant intended to influence [S.] to be a prostitute. [¶] It does not matter whether [S.] was a prostitute already." (CALCRIM No. 1151, some capitalization omitted).

Under the broad standard of relevance (Evid. Code, § 210), we agree with the Attorney General that S.'s statements to A. were relevant to both elements of the pandering charge, as they helped to explain why S., an adult, remained with Johnson and Williams despite the conditions she faced. More specifically, S.'s declared need for "somewhere to go" and the fact she was "addicted to drugs" were relevant to the prosecution's showing that defendants acted with the necessary specific intent. (See *Zambia*, *supra*, 51 Cal.4th at p. 980 [clarifying pandering is a specific intent crime where a "defendant intends to persuade or otherwise influence the target 'to become a prostitute' "]; *id*. at p. 973 [which includes "encouraging an existing prostitute . . . to work for him or someone else"].) Johnson disputes any relevance for this purpose, pointing out that the required elements and specific intent for the offense pertain to Johnson's conduct and intent, not S.'s. He argues that S.'s "reasons for staying with him had no rational tendency to prove he either arranged a place for her to prostitute herself or did so with the requisite intent." So too, Johnson asserts that S.'s statement that he supplied her with methamphetamine might have "proved her apparent source" for the drug but "said nothing about his intent when supplying her with it."

These arguments ignore the standard of relevance, which is "*any* tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.) We recognize that S.'s expression of despondence over not being able to see her children, her need for a place to stay, and her

70

addiction to methamphetamine would not serve as direct proof of Johnson's specific intent. But we have little difficulty concluding that the evidence had at least *some* tendency in reason to support a reasonable inference by the jury that S.'s mental state and drug addiction facilitated Johnson's ability "to influence [S.] to be a prostitute." (See CALCRIM No. 1151; § 266i, subd. (a)(2) [defining the crime of pandering to include "any person who . . . [¶] . . . [¶] (2) By promises, threats, . . . any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute"].)

This is especially true where there is other substantial evidence in the record documenting S.'s work as a prostitute while traveling with defendants and taking directions from Johnson, which the jury could have reasonably relied upon in finding that Johnson and Williams acted with the requisite intent. Because the focus of the pandering statute "is not on the character of a defendant's target, but on the social harm inherent in the defendant's conduct" in encouraging or influencing the prostitute to ply her trade (*Zambia*, *supra*, 51 Cal.4th at p. 974), S.'s mental state and vulnerability to that influence are relevant. For this reason, we reject Johnson's assertion that utilizing the evidence in this way requires reliance on "a link in the chain of circumstantial inferences" which has not been proven. The chain or logic in this instance was supported by substantial evidence and was not, as Johnson claims " 'mere speculation dressed up in the guise of evidence.' " (Cf. *People v. Lara* (2017) 9 Cal.App.5th 296, 324.)

Johnson additionally challenges A.'s testimony that Johnson was giving S. methamphetamine as outside the state of mind exception because it did not express S.'s state of mind, emotion, or physical sensation (Evid. Code, § 1250, subd. (a)(1)) and could not have been offered to prove or explain S.'s conduct (*id*., subd. (a)(2)). He argues that implicit in A.'s testimony affirming that Johnson supplied S.'s drugs is an underlying hearsay statement by S. in which S. shared this information with A. This is, in our view, a strained interpretation of the record, which reflects that A. shared a room with S. during the weeks in which they traveled the motel circuit and had intimate, firsthand knowledge

71

of S.'s moods, her preferred drug, and that Johnson was supplying S. with methamphetamine.

For these reasons, we conclude the trial court did not abuse its discretion by admitting S.'s out-of-court statements under the state of mind exception to the hearsay rule.

### E.  Instructional Error As To Mistake of Age

Williams contends the trial court erred in failing to instruct the jury that his good faith belief that A. was at least 18 years old was a defense to being an aider and abettor to counts 1, 2, and 3.  Williams acknowledges that he did not object in the trial court to the relevant jury instructions but asserts this court should review his claim under section 1259 as affecting his substantial rights.  The Attorney General contends that no error occurred and, even if it did, it was harmless because Williams was "clearly a direct perpetrator of these crimes."

### 1.  Additional Background

The trial court instructed the jury that the defendants could be guilty either as a direct perpetrator or as an aider and abettor.  (CALCRIM No. 400.)  With respect to the mens rea of an aider and abettor, the court informed the jury that the People must prove that "[t]he defendant knew that the perpetrator intended to commit the crime" and "[b]efore or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime."  (CALCRIM No. 401.)  In addition, the trial court instructed the jury that "someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."  (*Ibid.*, italics omitted.)

With respect to count 1 (human trafficking), the trial court instructed the jury in relevant part that the People must prove that "1. The defendant caused or induced or persuaded, or attempted to induce or persuade, another person to engage in a commercial

72

sex act; [¶] 2. When the defendant acted, he intended to commit a felony violation of Penal Code section 266h, Pimping. [¶] and [¶] 3. When the defendant did so, the other person was under 18 years of age. [¶] . . . [¶] Being mistaken about the other person's age is not a defense to this crime." (CALCRIM No. 1244, some capitalization omitted).

With respect to count 2 (pimping), the trial court instructed the jury in relevant part that the People must prove that "1. The defendant knew [A.] Doe was a prostitute; [¶] 2. The proceeds that [A.] Doe earned as a prostitute supported defendant, in whole or in part; [¶] and [¶] 3. [A.] Doe was a minor under the age of 16 years when she engaged in the prostitution. [¶] . . . [¶] A good faith belief that the minor is 18 years of age is not a defense to this charge." (CALCRIM No. 1150, some capitalization omitted).

With respect to count 3 (pandering), the trial court instructed the jury in relevant part that the People must prove that "1. The defendant arranged or procured a position for [A.] Doe to be a prostitute in either a house of prostitution or any other place where prostitution is encouraged or allowed; [¶] and [¶] 2. The defendant intended to influence [A.] Doe to be a prostitute; [¶] and [¶] 3. [A.] Doe was under the age of 16 at the time the defendant acted. [¶] . . . [¶] A good faith belief that the minor is 18 years of age is not a defense to this charge." (CALCRIM No. 1151, some capitalization omitted).

The jury convicted Williams of counts 1, 2, and 3. The jury verdict forms did not ask the jury to specify whether it found Williams guilty as a direct perpetrator or an aider and abettor.

Immediately following the discharge of the jury, trial counsel spoke with members of the jury. In a subsequent declaration filed in the trial court, Williams's trial counsel declared that the jurors " 'indicated that they had relied on the aiding and abetting theory as articulated by the prosecution in their closing argument' " when assigning criminal liability to Williams.

73

## 2. Legal Principles

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) "We of course presume 'that jurors understand and follow the court's instructions.'" (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

## 3. Analysis

Williams acknowledges that mistake of age is generally not a defense to human trafficking a minor or pimping or pandering a minor. Indeed, section 236.1, subdivision (f) of the human trafficking statute states, "[m]istake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section." However, relying on *Moses*, *supra*, 10 Cal.5th 893, Williams asserts that "[t]o be guilty of an attempt to commit [human trafficking a minor or pimping or pandering a minor], . . . the defendant must have the specific intent to commit the offense *against a minor*" and "[b]y analogy, the same is true for aiding and abetting another in the commission of the offenses."

In *Moses*, the California Supreme Court considered whether an individual could be convicted of section 236.1, subdivision (c) (hereafter section 236.1(c)) for having attempted to commit human trafficking of a minor if the individual the perpetrator believed was a minor was actually an adult, undercover police officer. (*Moses*, *supra*, 10 Cal.5th at pp. 895–896.) Factual impossibility is not a defense to the common law crime of attempt. (*Id*. at p. 900.) Nevertheless, section 236.1(c) specifically criminalizes attempting to induce a minor to engage in a commercial sex act, raising the question whether section 236.1(c) incorporates common law attempt principles or creates a new attempt paradigm.

74

The court in *Moses* tackled this question, examining whether the attempt prong of section 236.1(c) incorporates the common law principles of attempt (codified in the California Penal Code at section 21a and under which the defendant could have been found guilty) or instead created a distinct definition of attempt, such that factual impossibility would be a defense to the crime. (*Moses*, *supra*, 10 Cal.5th at p. 905.)

The California Supreme Court rejected the contention that section 236.1(c) creates a distinctive definition of attempt. (*Moses*, *supra*, 10 Cal.5th at p. 906.) In finding inapplicable the defense of factual impossibility to the attempt prong of section 236.1(c), the California Supreme Court relied upon the "electorate's intent to ensure just and effective punishment of child predators" (*id*. at p. 911) when enacting the statute. (*Id*. at p. 901.) It reasoned, "[t]here is no reason to conclude from the ballot materials that the electorate intended to impose lesser punishment on a defendant who intentionally targets a minor but fails in the attempt because the target is actually an adult. Given the initiative's stated purpose, it is more reasonable to conclude that section 236.1(c) operates as a one-way ratchet to increase punishment for both such offenders." (*Id*. at p. 912, italics omitted.)

In reaching its conclusion, the California Supreme Court decided that section 236.1, subdivision (f) does not apply to the attempt prong of section 236.1(c). "The statute eliminates a mistake of age defense if the defendant successfully induces a minor, even if acting under a mistake of fact. It does not speak to the converse situation, when the defendant attempts to induce a person the defendant actually believes to be a minor but who is in fact an adult. Under the provisions of subdivision (c) and the law of attempt, such conduct is punishable as human trafficking so long as the defendant intended to induce a minor to engage in such conduct. There is no inconsistency between disallowing a mistake of age defense when the victim is an actual minor and requiring a

75

specific intent to induce a minor when the defendant unwittingly targets a police decoy." (*Moses*, *supra*, 10 Cal.5th at p. 909, italics omitted.)[27]

Relying on the Supreme Court's holding in *Moses* that attempted human trafficking of a minor requires that the defendant have intended to induce a minor to engage in such conduct, Williams contends that aiding and abetting human trafficking of a minor (and pimping and pandering of a minor) require that the aider and abettor specifically intend to aid a crime *against a minor*.

The Fourth District Court of Appeal, Division 2, recently rejected this argument in *People v. Vaughn* (2022) 77 Cal.App.5th 609 (*Vaughn*). With respect to section 236.1 (for which Williams was convicted in count 1), the court in *Vaughn* stated, "the statute defining human trafficking of a minor declares: 'Mistake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section.' (§ 236.1, subd. (f).) A perpetrator and an aider and abettor are both principals in the same crime. (§ 31.) A person charged with human trafficking of a minor, as an aider and abettor, is subject to 'a criminal prosecution under' section 236.1. Thus, the plain language of the statute eliminates a mistake as to the victim's age as a defense for both a perpetrator and an aider and abettor." (*Id*. at p. 624.)

With respect to pimping (for which Williams was convicted in count 2), the court in *Vaughn* relied on a previous decision, *People v. Branch* (2010) 184 Cal.App.4th 516. The court in *Vaughn* stated that *Branch* "held that a good faith belief that the victim is 18 or older is not a defense to either pimping or attempted pimping of a minor." (*Vaughn*, *supra*, 77 Cal.App.5th at p. 626.) It concluded "the same reasoning applies to aiding and

---

[27] The court in *Moses* explicitly did not analyze "the interplay between subdivision (f) and the specific intent required for the attempt prong of section 236.1(c) when the defendant attempts, but fails, to induce an actual minor to engage in a commercial sex act." (*Moses*, *supra*, 10 Cal.5th at p. 909, fn. 10.) It "offer[ed] no view on whether a mistake of fact as to the victim's age would be a defense in that situation." (*Ibid*.)

abetting." (*Ibid*.) "Pursuant to *Branch*, the only criminal intent necessary to aid and abet pimping of a minor is the intent that the perpetrator commit pimping. The aider and abettor need not intend that the perpetrator commit pimping specifically of a minor. '[T]he age of the victim only affects the severity of the sentence, not the criminality of the conduct.' " (*Vaughn*, *supra*, 77 Cal.App.5th at p. 626, quoting *Branch*, at p. 522.)

Williams criticizes the analysis in *Vaughn*. He points out that the decision does not discuss *Moses*, *supra*, 10 Cal.5th 893, which was decided after *Branch*. He notes that the California Supreme Court in *Moses* cited *Branch* but did not specifically approve or disapprove of its analysis and instead merely distinguished it on its facts. Williams argues that the reasoning of *Moses* applies to aiding and abetting, which (like attempt) is a specific intent crime. He asserts that section 236.1(c) requires the defendant to induce a minor to engage in commercial sex acts, and therefore the aider and abettor must specifically intend to induce a minor in commercial sex acts. He contends the "same logic" applies to Williams's convictions in counts 2 and 3 for pimping and pandering.

We disagree. The California Supreme Court's analysis in *Moses* is firmly rooted in the law of attempt, and the traditional rejection in attempt law of the defense of factual impossibility. The law of aiding and abetting, by contrast, requires that "an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Moreover, "[m]istake of fact is, generally speaking, 'not a true affirmative defense.' [Citation.] It is, rather, an assertion by the defendant that a particular factual error in his perception of the world led him to lack the mens rea required for the crime." (*People v. Hendrix* (2022) 13 Cal.5th 933, 940, fn. omitted.)

A mistake of fact defense applies where the crime requires the perpetrator hold a criminal mens rea as to that element. (*In re Jennings* (2004) 34 Cal.4th 254, 277.) It is clear from the text of the statutes underlying counts 1, 2, and 3 that the prosecution need

not prove that the perpetrator (either as a direct perpetrator or an aider and abettor) have knowledge of the actual age of the victim. Instead, the criminal mens rea (held by the direct perpetrator and specifically intended by the aider and abettor) is facilitation of what can generally be characterized as a prostitution-related crime. (See *id*. at p. 278 [observing "the modern trend is to require proof of some criminal intent or knowledge in order to secure a criminal conviction"]; cf. *People v. Williams* (1991) 233 Cal.App.3d 407, 411 [stating "[t]he specific intent for the crime of selling cocaine to a minor is the intent to sell cocaine, not the intent to sell it to a minor"].)

In the human trafficking offense in count 1, the criminal mens rea is inducing a person to engage in a commercial sex act with the intent to "effect or maintain" a specified crime (in this case, pimping).[28] For the offense of pimping in count 2, it is knowledge the person is a prostitute, and (in the case of the aider and abettor) specific intent to assist or facilitate the direct perpetrator in deriving support from the earnings of the prostitute.[29] For the offense of aiding and abetting pandering in count 3, it is intending to assist or facilitate the direct perpetrator in procuring for another person a

---

[28] "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person *who is a minor* at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [s]ection 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking." (§ 236.1(c), italics added.)

[29] "Any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution, or from money loaned or advanced to or charged against that person by any keeper or manager or inmate of a house or other place where prostitution is practiced or allowed, or who solicits or receives compensation for soliciting for the person, when the prostitute is a minor, is guilty of pimping a minor, a felony, and shall be punishable as follows: [¶] . . . [¶] (2) *If the person engaged in prostitution is under 16 years of age, the offense is punishable by imprisonment in the state prison for three, six, or eight years*." (§ 266h, subd. (b), italics added.)

place as an inmate in a house of prostitution.[30]  None of these statutes requires that the prosecution prove the defendant knew or had a reasonable belief the victim was a minor—even if that defendant's liability is based on principles of aiding and abetting.

We do not read the California Supreme Court's decision in *Moses* as to the contrary.  The court's analysis in *Moses* centered on the fact that there was no actual minor victim.  It held that, under that circumstance, to be convicted of attempt, the person must intend to traffic a minor.  (See *Moses*, *supra*, 10 Cal.5th at p. 912 [rejecting the contention that defendant could be convicted of attempt "in the absence of an actual minor victim" and "without [the] intent to induce a minor victim"].)  The same imperative does not apply for an aider and abettor to a completed crime where there is an actual minor victim.

In *Moses*, the California Supreme Court remanded the matter to the Court of Appeal for further proceedings.  On remand, the Court of Appeal observed, "Where there is an actual minor victim, this mistake of age preclusion has the salutary effect of protecting minors.  As the Supreme Court has explained, when the mistake of fact defense regarding a victim's age is inapplicable, the defendant commits an offense involving a minor 'at his or her peril.'  [Citation.]  Precluding the defense renders the defendant's mental state regarding the victim's minority or majority immaterial."  (*People v. Moses* (2021) 65 Cal.App.5th 14, 22.)

---

[30] "(a) Except as provided in subdivision (b), any person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years:  [¶]  . . .  [¶]  (3) Procures for another person a place as an inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state.  [¶]  . . .  [¶]  (b) Any person who does any of the acts described in subdivision (a) with another person who is a minor is guilty of pandering, a felony, and shall be punishable as follows:  [¶]  . . .  [¶]  (2) *If the other person is under 16 years of age, the offense is punishable by imprisonment in the state prison for three, six, or eight years*."  (§ 266i, italics added.)

Williams advances no reason why this analysis would not apply equally to an aider and abettor as to a direct perpetrator. As did the Court of Appeal in *Vaughn*, *supra*, 77 Cal.App.5th 609, we decide that, where there is an actual minor victim, neither the language of sections 236.1(c), 266h, or 266i, nor general principles of aiding and abetting, require the aider and abettor to have any specific intent with respect to the age of the minor victim.

Other than the failure to instruct on a mistake of age defense, Williams does not argue any claim of error in the jury instructions on aiding and abetting for counts 1, 2, or 3. Williams's jury was instructed that it had to find beyond a reasonable doubt that A. was in fact under 16 years of age to convict him of those crimes. Under those circumstances, the prosecution was not required to prove that, as an aider and abettor, Williams need have any mens rea with respect to A.'s age. As the trial court did not err in omitting a mistake of fact defense as to that element of counts 1, 2, and 3, we reject Williams's appeal on this ground.[31]

### F. Admission of Johnson's Post-Arrest Statements

Johnson contends the trial court erred by admitting two postarrest statements that he made to Detective Sohal about having sex with A. and paying for her train ticket to California. Johnson asserts that Sohal did not " 'scrupulously honor' " his repeated invocations of the right to remain silent during an initial interview. Johnson further claims that Sohal improperly failed to readvise him of his *Miranda* rights and obtain a new waiver of those rights when he (Johnson) initiated a second interview and then made the challenged statements.

For the reasons discussed below, we reject Johnson's claim because he validly waived his *Miranda* rights before he made the challenged statements.

---

[31] Having reached the merits of Williams's challenge to the jury instructions, we need not examine his contention that his trial counsel was constitutionally ineffective for failing to object to the instructions.

### 1. Factual Background

Police arrested Johnson on May 26. The next day, Detective Sohal interviewed Johnson. At the beginning of the recorded interview, Sohal said he would read Johnson his *Miranda* rights. When Sohal asked if Johnson knew his *Miranda* rights, Johnson responded, "Yeah. You have the right to remain silent." Johnson also said "I know all of 'em" and asked Sohal, "so what am I being charged with?" Sohal proceeded to read the *Miranda* rights to Johnson, who said he understood each of them. Sohal did not explicitly ask Johnson for a waiver of these rights.

Detective Sohal then started asking questions and Johnson answered them. Some of the questions and answers involved Johnson's background, associates, and activities, including information about his date of birth, tattoos, fiancée's name, gold Mercedes Benz SUV, prior arrests, and financial assistance he had given to A. and Williams with the purchase of their train tickets to California.

Approximately halfway through the interview, Johnson asked if bail would be set and "what am I being detained for?"[32] Detective Sohal responded by asking Johnson about him staying in a motel and Johnson replied, "What motel?" Following further discussion about Johnson's activities, Johnson claimed not to know his cousin's name and asked, "But, [] can we talk about what I'm being detained for?" Sohal said "Yeah" but continued asking questions. Johnson next said, "You're not gonna tell me what I've been detained for?" Sohal, responded, "Ah, well what. . ." Johnson replied, "I'm not gonna answer no more questions unless you tell me what I'm being detained for." Sohal responded, "So, well we'll get to all that man, relax." Johnson responded, "*I'm done talkin' to you* then 'cause I'm not gonna keep talkin' and you not telling me what I'm being detained for. And why you askin' me all these questions. They came and got me

---

[32] Any grammatical errors in the statements quoted here appear in the interview transcripts. We do not note the errors.

out of my room for no reason and now you don't wanna tell me why I'm being detained." (Italics added.)

Even though Johnson said he was " 'done talkin[g]' ", Detective Sohal continued to ask Johnson questions. Sohal said, "'Kay, let me ask you this. So now that you – you're gonna know exactly why – why you're being detained okay? Um, when's the last time, uh, you put up an ad for, uh, prostitution?" Johnson answered, "None." Sohal then asked Johnson questions about his phone and said the police were investigating "pimping out those girls."

Johnson denied ever pimping, posting ads for prostitution, or sending out pictures of certain women. Johnson and Detective Sohal continued speaking along the same lines.

When Detective Sohal eventually asked if Johnson knew about a certain telephone number (with a 530 area code), Johnson said "Uh-uh. But I'm ready to go, 'cause I need to use the phone to call my family, let 'em know where I'm at, because y'all just detained me for no reason and then you have me in here, so what's (unintelligible) what y'all [go]nna do?" Sohal said he would "explain everything" to Johnson, and Johnson reiterated, "[a]re you gonna explain it? I'm ready to go. If y'all gonna take me to the county. . ." Sohal then asked, "do you want to answer any more questions?" Johnson replied, "No, I'm ready . . . to get my phone call." Sohal said, "Okay. All right, man."

After Johnson was escorted out of the interview room to a holding cell, Detective Sohal asked Johnson if he wanted to know his charges. Johnson said he did not care about the charges, was ready to go to county jail, and asked when he would be taken there.

Detective Sohal explained that because there was an allegation that Johnson had sex with A., a sexual assault exam would be conducted by a nurse, and Johnson's clothing and "samples" would be collected from him. In response Johnson said, "A [] sexual assault? [¶] . . . [¶] The fuck is that? What you mean, a sexual assault?" Sohal told Johnson that, in addition to the allegation regarding a rape, he was being charged

with juvenile sex trafficking, pimping, and pandering.  Johnson asked, "How the fuck I'm charged with juvenile. . .  [¶]  . . .  [¶]  . . . sexual trafficking?  That bitch ain't come with me."  Sohal responded, "Hey, so, you didn't want to talk to me no more, and you don't even want to hear what your charge is, so I'm just lettin' you know what's up, and then that's gonna be the next step."  Johnson replied, "That's crazy."  The recorded interaction ended with Johnson and Sohal each saying "All right."

Later, Johnson asked to speak to Detective Sohal again.  The second interview (which was indisputably at Johnson's request) took place about four hours after the end of the first interview.

Detective Sohal began the second interaction by saying to Johnson, "So I heard you wanted to talk to me."  Johnson replied, "Yeah, man.  Now I didn't rape nobody."  Sohal said, "Ok."  Johnson added, "We did have sex but it was consensual."  Sohal again said, "Ok."  Johnson continued, "I never raped her.  I never made her do anything against her will.  She [] was doin' her own things. . . .  [E]verybody rolled me [] for room and board.  So they paid their way.  They helped me with gas and they paid for their own rooms.  I did not have nothin' to do with nothin' what they was doin'.  [¶]  . . .  [¶]  I had my own thing."  Johnson added that he and others were spending his birthday together and A. "told us [she was] 33 and born in '85.  I never knew how old she was until you said I raped a minor and I [] never knew she was a minor.  She lied all this time."

Detective Sohal's first question to Johnson in the second interview was, "She [] didn't tell you that she was a minor?"  Johnson replied, "Never ever – ever.  Everybody she went around – I got a million witnesses."  Sohal responded "Ok."

Johnson continued talking and said that when A. and Williams asked for help with the cost of their train tickets, A. said, " 'I know how to get it.  When I get out there I'm gonna do my thing and I'll just give your money back for me and [Williams].'  So I said, 'Ok. I'll let y'all borrow the money.  That was it.  It wasn't me makin' 'em do anything

or sayin' I'm pimpin' 'em or nothin' 'cause I ain't no pimp. How am I a pimp with $100 in my pocket." Johnson next said, "And then I get all these charges on me for traffickin'. How I'm traffickin' anyone?" Detective Sohal responded by asking if Johnson had "put a gun to her head" and made her have intercourse with him. After Johnson said no, Sohal asked, "How did it go down then?" The discussion continued and Johnson reiterated that he had had sex with A. and said that A. had paid him back only $300 toward the train ticket he had purchased for A. to travel to California.

During this second interview, Johnson offered a variety of explanations about why he had asked to speak to Detective Sohal again. Johnson said that it "tore [him] up" when Sohal had said that he (Johnson) trafficked and raped a minor and he wanted to talk to Sohal to tell him "the truth about everything that was goin' down." Johnson also said, "And then when you told me my charges oh yeah I'm fixin' to tell you everything. 'Cause that ain't me." He also said, "That's why I called you to let you know the real truth because I didn't say nothin' because I didn't want to talk. That – 'cause I didn't – but when you told me that trafficking a minor and raping somebody that's what threw me off. I'm – I'm wonderin' like who the fuck did I rape."

Eventually, after Detective Sohal questioned Johnson about the 530 telephone number, Johnson asked, "Where is my – when will I be able to see my lawyer? 'Cause you – you the detective for her case ain't it – yeah." Sohal responded by explaining that he was the detective for the "whole case" and that he was "not a detective for her." Sohal further explained that his job was take what people say, "get it all together, write it all up and then send it to the district attorney." The interview continued for a while longer and included discussion about the telephone number.

### 2. Trial Court Proceedings

Pretrial, Johnson filed an in limine motion challenging the admissibility of his statements to Detective Sohal on *Miranda* and voluntariness grounds. Johnson asserted that he twice told Sohal that the "interview was over," but Sohal continued to ask him

84

questions. Johnson further asserted that when Sohal subsequently returned to interview him a second time, Sohal ignored Johnson's question " 'where's my lawyer?' " and statement " 'I'm done talking to you.' "

The prosecutor asserted in limine that Johnson had waived his *Miranda* rights. The prosecutor sought to present at trial five statements Johnson had made about (1) his date of birth, (2) his " 'Jigga' " tattoo, (3) his fiancée Megan M., (4) his gold Mercedes Benz SUV, and (5) that he had sex with A. on May 26, 2019.

At a pretrial hearing on the motions, Johnson's defense counsel reiterated his objection under *Miranda*. The prosecutor informed the trial court of an additional desire to present the statement Johnson had made about having paid for A.'s train ticket to California and the debt she owed him for it. Johnson's counsel responded that he did not have an objection to the first four statements the prosecutor was seeking to admit. However, counsel had "some concern" about the statements regarding Johnson having had sex with A. and A. still owing him money for the train ticket. The court agreed to schedule a hearing so it could rule on the objection.[33]

At trial, Detective Sohal testified to all six statements discussed in limine, including the two that were the subject of Johnson's ultimate objection. Regarding those two statements, Sohal said Johnson told him he had had sex with A. at the Motel 6 on May 26, and he had paid $575 for A.'s train ticket to Sacramento and that A. "had only paid him back $300 towards those $575."

The next court day, Johnson's defense counsel noted for the record his earlier objection to the introduction of Johnson's statements. Counsel argued that Johnson had "made six separate statements that were unambiguous assertions of his right to remain silent" and "[a]t a second interview, he also made a clear request for a lawyer." Counsel asked the trial court "to exclude any mention of his testimony [*sic*]."

---

[33] There is no indication in the record that any formal hearing on the issue occurred.

The court stated that it had previously reviewed the recorded interviews, heard argument, and ruled on Johnson's motion during an off-the-record proceeding.  The prosecutor reiterated her arguments that Johnson never made a "direct request" for an attorney, all of the statements testified to by Detective Sohal "happened before the alleged invocation" of the right to counsel, Johnson's statements concerning his right to remain silent were ambiguous, and the admitted statements were made after the first interview had ended and Johnson voluntarily reinitiated another conversation with Sohal.

The trial court explained its ruling as follows:  Johnson's "initial comments . . . about being done talking, which occurred a few times in the initial interview, were really more subject based than expressions of a right to remain silent."  The court further said that "it appear[ed] to the court that [Johnson] was done talking about [a certain subject], as opposed to done talking overall."  In addition, the court explained that, after the first interview had ended, Johnson "voluntarily reengages with the officer after which time he makes the statements that were ultimately admitted into this trial."  The court thus concluded that (1) Johnson did not invoke his right to remain silent; (2) even if Johnson did, his voluntary initiation of the second interview "dissipate[d] any taint" from the first; and (3) Johnson's comment " 'When am I going to see my lawyer' " was not an unequivocal assertion of his right to counsel.

### 3.  Legal Principles

"In a custodial interrogation, 'the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.'  . . .  'In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.' " (*People v. Sumagang* (2021) 69 Cal.App.5th 712, 725.)  Put differently, a suspect can impliedly waive his or her *Miranda* rights by "express[ing] willingness to answer questions after

86

acknowledging an understanding of [such] rights." (*People v. Cruz* (2008) 44 Cal.4th 636, 667; *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384.)

"When a suspect knowingly and intelligently waives the *Miranda* rights, 'law enforcement may interrogate, but if at any point in the interview [the suspect] invokes the right to remain silent or the right to counsel, "the interrogation must cease." ' [Citation.] Once the suspect has invoked, 'a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation . . . . [There is to be no] further interrogation by the authorities . . . unless the accused himself initiates further communication, exchanges, or conversations with the police.' [Citations.] 'In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching" — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request [to remain silent or] for counsel's assistance.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1103–1104 (*Ramirez*).)

"A defendant who has waived the *Miranda* rights must make a 'clear assertion' of the right to silence or counsel before officers are required to cease questioning. [Citations] 'The applicability of the " 'rigid' prophylactic rule" of *Edwards* [*v. Arizona* (1981) 451 U.S. 477] requires courts to "determine whether the accused *actually invoked* his right[s] . . . ." ' [Citation.] Ambiguous or equivocal references to an attorney or the right to silence do not require cessation of questioning. [Citations.] Whether the defendant made an invocation is analyzed from the perspective of a reasonable officer [citation], and takes into consideration the context of the statement [citation]. If 'a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right,' then the officer need not cease all questioning immediately." (*Ramirez*, *supra*, 13 Cal.5th at p. 1104.)

An accused initiates further "dialogue when he speaks words or engages in conduct that can be 'fairly said to represent a desire' on his part 'to open up a more

87

generalized discussion relating directly or indirectly to the investigation.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648.) "Even when a suspect initiates further discussions [after having invoked his *Miranda* rights], the burden remains on the prosecution to show by a preponderance of the evidence that the suspect knowingly, intelligently, and voluntarily waived the rights he had previously invoked. [Citations.] We independently review the validity of the waiver ' "in light of the record in its entirety, including 'all the surrounding circumstances—both the characteristics of the accused and the details of the [encounter]'. . . ." ' " (*People v. Molano* (2019) 7 Cal.5th 620, 661 (*Molano*); *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045–1046 (*Bradshaw*).) "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.)

"In reviewing *Miranda* claims, we 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.' [Citations.] We review *Miranda* claims under federal constitutional standards." (*People v. Johnson* (2022) 12 Cal.5th 544, 578.)

### 4. Analysis

Johnson argues that, although he may have impliedly waived his *Miranda* rights at the beginning of the first interview, "he thereafter negated any such implication by unambiguously invoking his right to remain silent multiple times." Johnson further asserts that Detective Sohal "did not 'scrupulously honor' these repeated invocations" and "later failed to re-admonish Johnson and obtain a waiver from him when Johnson re-initiated the interview. This omission obviated the implied waiver." Johnson continues: "In the absence of a freshly-made express waiver, the People cannot satisfy their burden of establishing an implied waiver. In light of the inherently coercive pressure of a

custodial setting, the frequent refusal to honor the invocations and the failure to re-admonish, they cannot persuasively demonstrate the voluntariness necessary to imply Johnson made a knowing and intelligent waiver by re-initiating the interrogation and speaking to Sohal."

The Attorney General argues that Johnson's purported invocations of his right to remain silent (made after his initial *Miranda* waiver) were conditional and ambiguous. The Attorney General further asserts that even if Johnson unambiguously invoked his right to silence during the first interview, he reinitiated the interview and thereby revoked his earlier invocation. Lastly, the Attorney General contends that the admission of Johnson's statements about having sex with A. and the train ticket was harmless beyond a reasonable doubt.

We begin our analysis of the parties' contentions by noting that there is no dispute that Johnson impliedly waived his *Miranda* rights at the inception of the first interview. Rather, the disputed issues relate to whether (1) Johnson later clearly asserted his right to remain silent during the first interview, (2) Detective Sohal failed to cease questioning Johnson in the face of such an invocation, and (3) Johnson knowingly, voluntarily, and intelligently waived his *Miranda* rights upon reinitiating conversation with Sohal.

As described above, the two statements at issue here (about Johnson having had sex with A. and having paid for her train ticket) were made during the second interaction.[34] In light of this circumstance and the disputed issues, we will assume arguendo for our analysis that Johnson clearly asserted his right to remain silent in the first interview when he told Detective Sohal "I'm done talkin' to you." Further, given that assumption, we conclude Sohal failed to scrupulously honor Johnson's assertion of

---

[34] The four other statements admitted at trial were made by Johnson during the first interview—after his implied *Miranda* waiver but before any purported invocation of his right to remain silent by stating he was "done talkin'."

89

his *Miranda* rights by continuing to question Johnson after Johnson said that he was "done talkin'."

We turn to the remaining question whether Johnson's *subsequent* request to speak to Detective Sohal and the reinitiation of conversation about four hours after the first interview ended amounts to a knowing, voluntary, and intelligent waiver of his *Miranda* rights. As discussed above, we look to the totality of the circumstances to determine whether the prosecution can show by a preponderance of the evidence that Johnson waived the rights he had previously invoked. (*Molano*, *supra*, 7 Cal.5th at p. 661.)

On this record, we decide there is ample proof to support that Johnson validly, impliedly waived his *Miranda* rights during the second interview before he made the two challenged statements. Looking first at what Johnson said about his *Miranda* rights at the beginning of the first interview, it is evident that Johnson (who had been arrested before) had a clear understanding of his rights when he first started talking to Detective Sohal and throughout his interactions with him. Johnson said that he "kn[e]w all of" the *Miranda* rights and recited the right to remain silent. Johnson further said he understood each of the *Miranda* rights Sohal read to him and proceeded to answer many questions for some time, before saying he was done talking to Sohal.

While Detective Sohal should have ceased questioning Johnson in the first interview after Johnson said he was done talking, nothing in the first interview (including the subsequent questions) suggests coercion or any coercive effect on Johnson and his understanding of his *Miranda* rights. Rather, Johnson consistently demonstrated his resolve not to incriminate himself in the face of continued questioning by Sohal. For example, Johnson steadfastly denied pimping or posting ads for prostitution. He also denied having had sex with A. when Sohal asked if he had done so. Additionally, Johnson maintained that he was being detained for no reason. He asked Sohal if he was going to explain the reason for the detention just before telling Sohal "I'm ready to go" and that he did not want to answer any more questions.

90

Under these circumstances, we conclude that there was no coercive conduct by Detective Sohal during the first interview that would render involuntary Johnson's subsequent reinitiation of discussions with Sohal or render invalid any implied waiver of Johnson's *Miranda* rights during the second interview. (See *Oregon v. Elstad* (1985) 470 U.S. 298, 314 ["[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion."]; see also *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 220.)

Similarly, the interaction that occurred after the end of questioning at the first interview does not show coercion. After Johnson was escorted out of the interview room, Detective Sohal explained to him that because there was an allegation that he had had sex with A., a sexual assault examination would be conducted, and items would be collected from him before transport to county jail. Johnson replied by asking Sohal about the sexual assault allegation, and Sohal added that the other charges included juvenile sex trafficking, pimping, and pandering. Johnson questioned how he could be charged with sex trafficking, seemingly calling that allegation "crazy." Like the earlier interaction in the interview room, this interaction between Johnson and Sohal was not coercive and shows that Johnson's resolve to deny the allegations remained intact.

Turning to the second interview, the evidence shows that Johnson independently initiated the second interaction with Detective Sohal. When Sohal met with Johnson about four hours after the first interview ended, Johnson immediately began talking (without any questioning by Sohal) and volunteered that (contrary to his earlier statement) he had had consensual sex with A. Johnson asserted that he did not coerce A. to do anything and had nothing to do with her prostitution activities. Further, Johnson explained that he reinitiated the conversation with Sohal because he (Johnson) was troubled by the allegations of rape and juvenile trafficking and wanted to "tell [Sohal] the truth about everything that was goin' down."

91

Johnson ultimately stated various admissions, denials, and explanations during the second interview. All told, Johnson's request to speak with Sohal coupled with his spontaneous divulgences when Sohal arrived demonstrate Johnson's independent and voluntary desire to talk about the investigation, confront the allegations against him, and tell his purportedly truthful side of the story. (See *Bradshaw*, *supra*, 462 U.S. at p. 1045 [reinitiation is shown by "a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation"].)

Under these circumstances, we conclude that there is proof by a preponderance that, notwithstanding Detective Sohal's failure to re-admonish Johnson about his *Miranda* rights, Johnson knowingly, voluntarily, and intelligently waived his *Miranda* rights by implication when he summoned Sohal and started talking and answering questions a second time. The facts support the conclusion that Johnson knew and understood his *Miranda* rights throughout his interactions with Sohal. The facts also indicate that Johnson made an affirmative and voluntary decision to talk with Sohal a second time to address the allegations being leveled against him and answer Sohal's questions. We decide that the voluntariness of Johnson's decision to talk to Sohal again was not undermined or tainted by the questioning and conversation that followed Johnson's invocation of his right to remain silent during the first interview. We therefore reject Johnson's claim that the trial court erred in admitting his statements made during the second interview with Detective Sohal about having sex with A. and paying for her train ticket to California. (See *People v. Jackson* (2016) 1 Cal.5th 269, 340–341; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1089–1090.)

### G. Cumulative Prejudice

Williams contends that the combined effect of the errors asserted deprived him of his rights to due process and a fair trial. Johnson joins this claim and also contends he suffered additional prejudice as a result of the erroneous admission of S.'s hearsay statement and the trial court's denial of his motion to exclude his postarrest statements.

The premise of cumulative error fails, however, because defendants have not established error and there is no cumulative prejudicial impact to gauge. (See *People v. Salcido* (2008) 44 Cal.4th 93, 156.) We conclude that cumulative prejudice did not deprive either defendant in this case of a fair trial.

### H. Sentencing Claims

Williams requests that we remand his case for resentencing based on recent changes to section 654 made by Assembly Bill 518. Johnson joins Williams's request and similarly asks that we remand for resentencing.

Effective January 1, 2022, section 654 was amended by Assembly Bill 518. (Stats. 2021, ch. 441, § 1.) As amended, section 654, subdivision (a), provides in relevant part, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose the term that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).)

The Attorney General concedes that the recent legislative changes to section 654 apply to Williams and Johnson because their judgments are not yet final. We agree. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379; *People v. Sek* (2022) 74 Cal.App.5th 657, 673.) Nevertheless, the Attorney General opposes resentencing for both Williams and Johnson, asserting that "remand would be an idle act" given the way the trial court originally imposed their sentences.

At Williams's November 2020 sentencing hearing, defense counsel asked the trial court to dismiss or strike the coercion enhancement attached to count 1. The prosecutor opposed Williams's request, stating that a sentence of 15 years to life was appropriate for the counts involving A. The court did not strike the enhancement and said that "the conduct in this case is severe and significant." The court further noted that "Mr.

93

Williams'[s] conduct . . . is significant with regard to [A.] and her testimony was clear and persuasive with regard to his involvement, specifically as to the acts she was being forced to commit."

In accord with its statements, the trial court sentenced Williams to 15 years to life on count 1 for sex trafficking with coercion (§ 236.1, subd. (c)) and imposed a concurrent middle term of four years on count 5 for pimping an adult (§ 266h, subd. (a)). The court also imposed stayed middle terms, pursuant to section 654, of six years on counts 2 (§ 266h, subd. (b)(2) [pimping a minor]) and 3 (§ 266i, subd. (b)(2) [procuring a minor]) and four years on count 6 (§ 266i, subd. (a)(1) [procuring an adult]).

At Johnson's November 2020 sentencing hearing, his defense counsel asked the trial court to consider imposing concurrent sentences despite the probation department's contrary recommendation. The prosecutor stated her agreement with the probation department's recommendation of upper term sentences. Prior to imposing sentence, the trial court stated that the case was "an extremely serious matter," "Johnson's involvement in it was substantial," and the sentence would recognize that. The court also explained that it would impose concurrent sentences for unstayed terms not because those charges were unserious, but because the court thought "a term of 15 years to life in prison adequately addresses the seriousness of the overall conduct that Mr. Johnson took part in."

In accord with its statements, the trial court sentenced Johnson to 15 years to life on count 1 for sex trafficking with coercion (§ 236.1., subd. (c)) and imposed concurrent middle terms of four years on count 5 for pimping an adult (§ 266h, subd. (a)) and two years on count 4 for a lewd or lascivious act on a child (§ 288, subd. (c)(1)). The court also imposed stayed middle terms, pursuant to section 654, of six years on counts 2 (§ 266h, subd. (b)(2) [pimping a minor]) and 3 (§ 266i, subd. (b)(2) [procuring a minor]) and four years on count 6 (§ 266i, subd. (a)(1) [procuring an adult]).

94

At the time the trial court sentenced Williams and Johnson, it had no discretion to choose which counts to stay under section 654. (§ 654, former subd. (a).) Generally, when a change in the law confers previously unavailable discretion on a trial court, "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. Jones* (2019) 32 Cal.App.5th 267, 273; *People v. McVey* (2018) 24 Cal.App.5th 405, 418.) We review the sentencing court's statements and sentencing decisions to infer what its intent would have been. (*Jones*, at p. 273.)

Under the present circumstances, we decide that a remand for resentencing is proper for both Williams and Johnson. Although the trial court expressed its preference for the 15-years-to-life sentence, the court did not indicate an intent to impose the maximum amount of time possible on Williams and Johnson. Because the record contains no clear indication that the court would not consider reconfigured lesser sentences under current section 654 for Williams and Johnson, we will remand so the trial court may fully resentence each of them anew under the new law. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893.) At resentencing the trial court will have the opportunity to exercise its discretion to apply current section 654. We express no opinion on how the court should exercise its sentencing discretion.

Because we vacate Williams's and Johnson's sentences entirely and remand for full resentencing, we need not consider their claims that their 15-years-to-life sentences constituted cruel and unusual punishment in violation of the United States and California Constitutions. Those claims are not yet ripe for our review, and we do not examine them further. Should they choose to do so, Williams and Johnson may raise their cruel and unusual punishment claims in the trial court during resentencing.

Additionally, we need not address Williams's and Johnson's claims that we should vacate the $129.75 criminal justice administration fee imposed at their sentencing

95

hearings (see Gov. Code, former § 29550 et seq.) because of changes made by Assembly Bill 1869 (see Gov. Code, § 6111). Williams and Johnson may raise any issue regarding that fee in the trial court during resentencing.

Furthermore, for the trial court's benefit at resentencing and in completing new abstracts of judgment, we note that the original abstract of judgment for Johnson is incorrect. Although Johnson was sentenced to both indeterminate and determinate terms, the clerk of the court completed only an abstract of judgment for the indeterminate terms and listed the determinate-term counts on that abstract, but the clerk did not state the sentences imposed by the court on those determinate-term counts anywhere in the abstract of judgment. The determinate terms imposed by the court should have been listed on a separate abstract of judgment designated for determinate-term counts.

On remand, the trial court will generate new abstracts of judgment and minute orders based on its resentencing and will exercise its usual prerogative to ensure that the abstracts of judgment and sentencing minutes comport with the sentence pronounced. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

## III. DISPOSITION

The judgment against Johnson is reversed, his sentence is vacated, and the matter is remanded to the trial court solely for resentencing consistent with this opinion under current law, including Penal Code section 654 as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.). Johnson's convictions are affirmed.

The judgment against Williams is reversed, his sentence is vacated, and the matter is remanded to the trial court solely for resentencing consistent with this opinion under current law, including Penal Code section 654 as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.). Williams's convictions are affirmed.

_____
Danner, J.

I CONCUR:


_____
Greenwood, P.J.

**H048633,** *People v. Johnson*
**H048722,** *People v. Williams*

Lie, J., Concurring:

Although I join the majority in its judgment and much of its thoughtful analysis, I lack the majority's conviction that the record here reflects no violation of the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1).  In my view, the appellate record establishes the substantial likelihood of a violation, though one rendered harmless beyond a reasonable doubt by the damning litany of the defendants' documented communications and the violence they variously inflicted or threatened against 14-year-old A. Doe.  (See Stats. 2022, ch. 739 (Assem. Bill No. 256) (2021-2022 Reg. Sess.), § 2, eff. Jan. 1, 2023 [adding Pen. Code, § 745, subd. (k)[1]].)  I write separately to explain why, on this record, the term "gorilla pimp" is "racially coded" and not excusable by any viable theory of relevance.[2]

The Attorney General, to contextualize its contrary view, begins by asserting that "this was not a trial marked by racial overtones."  I wish it were so.  But Christopher Johnson and Antoine Williams, both Black men, were charged with the coercive sex trafficking of A. Doe, a 14-year-old White girl, whom they advertised as an "[e]xotic mix" who "love[s] White guys."  Courts of disparate jurisdictions have recognized the pervasiveness of "racial overtones" in circumstances involving even noncoercive interracial sexual relations.  (See, e.g., *State v. McKenzie* (Wash. Ct. App. 2022) 21 Wash.App.2d 722, 734 (*McKenzie*) [where a Black man was accused of attempting to have sex with a fictitious 13-year old White girl, "[t]his factual backdrop alone presented unavoidable racial overtones"]; *Bennett v. Stirling* (4th Cir. 2016) 842 F.3d 319, 326

---

[1] Undesignated statutory references are to the Penal Code.
[2] I agree with the majority that other language with which the defendants take issue is not racially discriminatory as used here.  (Maj. opn., *ante*, at p. 63.)

(*Bennett*) [prosecutor's allusions in a sentencing trial to the Black male defendant's "blonde" sexual partner appealed to the jury's potential racial prejudice].)

To be clear, nothing in this record suggests that either the investigator or the prosecutor who called her as an expert witness either intended to amplify those racial overtones or appreciated that "gorilla pimp" carried any racial connotation.  As the Legislature has clarified, however, a defendant seeking to establish a violation of the Racial Justice Act "does not need to prove intentional discrimination."  (Stats. 2022, ch. 739 (Assem. Bill No. 256), § 2, eff. Jan. 1, 2023 [amending § 745, subd. (c)(2)].)  And from its inception, section 745 has defined "racially discriminatory language" broadly and without apparent limitation as to the speaker's purity of motive:  " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin.  Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory."  (§ 745, subd. (h)(3).[3])  Accordingly, the "racial charge" or "racial coding" of specific language is premised on its content, context, and potential effect, gauged from an objective viewpoint rather than the individual speaker's.

The investigator's comments here, however unwittingly, "mined a vein of historical prejudice" against those "who have been appallingly disparaged as primates or members of a subhuman species in some lesser state of evolution."  (See *Bennett*, *supra*, 842 F.3d at pp. 324-325 [affirming on de novo review the grant of habeas relief from a

[3] Effective January 1, 2023, this provision will be renumbered as section 745, subd. (h)(3).  (Stats. 2022, ch. 739 (Assem. Bill No. 256) § 2.)

sentence of death]; see also *Jordan v. Alternative Res. Corp.* (4th Cir. 2006) 447 F.3d 324, 332 (dis. opn. of King, J.) (*Jordan*) [speaker's repeated references to Black employees as monkeys "plays on historic, bigoted stereotypes that have characterized [Black people] as uncivilized, non-human creatures that are intellectually and culturally inferior to white[] [people]"], overruled on other grounds by *Boyer-Liberto v. Fontainebleau Corp.* (4th Cir. 2015) 786 F.3d 264, 268-269.) " 'The historical record is replete with examples of Europeans attributing animal characteristics to [Black people], culminating in controversial conjecture originating in . . . seventeenth[-]century England that [Black people] had sprung from apes.' " (*Jordan*, *supra*, at p. 332 (dis. opn. of King, J.), fn. 3, quoting D. Marvin Jones, *Darkness Made Visible: Law, Metaphor, and the Racial Self* (1993) 82 Geo. L.J. 437, 466.)[4]

Although section 745, subdivision (a)(2)'s prohibition on the use of racially discriminatory language "does not apply if the person speaking is relating language used by another that is relevant to the case," I fail to discern the relevance of testimony that some victims of human trafficking have adopted the term "gorilla pimp," whatever the term's origins, to describe a particular species of sex trafficker. The prosecutor and clinical psychologist Dawn Blacker each confirmed the term's lack of relevance by abstaining from its use while effectively presenting the same distinct human trafficking tactics that the investigator recounted. No "disputed fact . . . of consequence to the determination of the action" (Evid. Code, § 210) is illuminated by the term: it is not "gorilla pimp" but at most what the term ostensibly meant that would be relevant and admissible here. That common victim experiences of coercion and trauma extend to a common vernacular does not make relevant the racially coded terms of that vernacular.

---

[4] As though to accentuate this "simianization" of the defendants (see *McKenzie*, *supra*, 21 Wash.App.2d at p. 732), the prosecutor in closing argument referred to A. as "our child" and "this little girl"—terms that cast the White female victim as the jury's infantilized kin.

3

It is likewise immaterial, in my view, that no one at trial explicitly labeled Johnson or Williams as "gorilla pimps." The context and framing of the investigator's testimony made the missing link clear: the investigator identified herself as an employee of the District Attorney and described her assignment from 2016 to 2019 (the year of the charged offenses) to a county task force charged with the investigation of human trafficking. To the extent those identifiers permitted any ambiguity as to the investigator's opinion as to whether the investigator intended any of her typologies of sex trafficking to describe Johnson and Williams, the prosecutor's exchange with the investigator immediately after the court deemed her qualified as an expert would have dispelled it: the first two questions established that the prosecutor had provided her "police reports and other evidence in this case" and that what followed would be "some questions generally that will help us to interpret the evidence that we're going to have in this case." In contrast, when examining Blacker, the prosecutor made a point of emphasizing that Blacker had received no case-specific information, signaling to the jury that Blacker could not have formed an opinion on the case. That the investigator—employed by the prosecuting agency and involved in the county task force responsible at the time of the offenses for investigating human trafficking—had been provided by her employer with case-specific evidence to "help us to interpret the evidence" left no doubt as to her expert opinion as to Johnson, Williams, their conduct, and their "gorilla pimp" coercion.

Assuming for argument's sake that this framing of the investigator's testimony did not implicitly convey the opinion on the ultimate issue of guilt which *People v. Leonard* (2014) 228 Cal.App.4th 465, 493 (*Leonard*) precludes an expert witness from offering, the racially discriminatory language nonetheless strikes me as particularly injurious in the context of profile evidence, "a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226 (*Prince*).) In other words, even race-neutral profile

4

evidence relies on the presumed significance of shared characteristics or behaviors as reflective of shared criminal objectives. Our tolerance for racial coding of profile evidence can only reinforce implicit racial bias and, in a trial of defendants of the coded race, "undermines public confidence in the fairness of the state's system of justice" (Stats. 2020, ch. 317, § 2) even where the record leaves no reasonable doubt that the jury would have reached the same result absent the error.

My agreement with the defendants that "gorilla pimp" is racially discriminatory language does not, however, extend to their alternative argument—raised jointly on appeal and by Williams in his supplemental petition for writ of habeas corpus—that counsel was ineffective for failing to assert a violation of the Racial Justice Act. Racially coded language is insidious in both silencing those who recognize its import and in escaping conscious recognition by others. (*McKenzie*, *supra*, 21 Wash.App.2d at p. 731.) And many who recognize the racial dimension of such language have reasonably considered it tactically unwise to call it out. Accordingly, "it is not uncommon for coded language to slide by at trial without objection." (*Ibid.*) Indeed, the terminology I would conclude violates section 745, subdivision (a)(2) on this record has long been tolerated. (See, e.g., *Leonard*, *supra*, 228 Cal.App.4th at p. 493; *People v. Zambia* (2011) 51 Cal.4th 965, 971.) Moreover, the trial here predated passage of the Racial Justice Act itself, and judgment was entered more than a year before the Legislature would amend section 745, subdivision (c)(2) to clarify that a defendant need not prove intentional discrimination. Given this combination of circumstances, the record does not establish that trial counsel's 2020 failure to assert a violation of the act or anticipate the act's evolution fell below an objective standard of professional competence.

For these reasons, I concur in the judgment but respectfully decline to join II.B.3 and II.C.3.b of the majority opinion, *ante*.

5

_____
Lie, J.

**H048633** *People Johnson*
**H048722** *People v. Williams*